[No. A128108. First Dist., Div. Two. May 12, 2011.]

Guardianship of CHRISTIAN G., a Minor.
MARK G. et al., Petitioners and Respondents, v.
JOHN G., Objector and Appellant.

582

**COUNSEL**

Janet H. Saalfield, under appointment by the Court of Appeal, for Objector and Appellant.

Mark G. and Tina G., in pro. per., for Petitioners and Respondents.

OPINION

RICHMAN, J.—

## INTRODUCTION

The difficult question ultimately presented by this case is whether a four-year-old developmentally delayed, possibly autistic child should be kept under the guardianship of his ex-convict uncle and his wife, who both have a history of substance abuse, or whether he should be returned to his father, who appears to be mentally ill. The issue before this court, however, is a procedural one, which does not resolve that question.

John G., the father of Christian G.[1] (Chris), appeals after the probate court appointed John's brother, Mark G., and Mark's wife, Tina, as guardians, a guardianship he contested all along, claiming both that a guardianship was unnecessary and that Mark was not a good choice as guardian due to his criminal history. John's appeal claims that the probate court erred in failing to follow the mandate of Probate Code section 1513, subdivision (c)[2] which, in cases involving parental abuse or neglect, requires a referral to the county agency charged with investigating dependency cases so that it may make a decision whether to initiate dependency proceedings.

We agree, and hold that John was deprived of certain procedural safeguards when the probate court failed to refer the case to child protective services (CPS) after it became apparent that Mark's allegations about John's parenting deficiencies amounted to a charge that he was an unfit parent. We thus reverse and remand the case for compliance with section 1513, subdivision (c).

## FACTUAL AND PROCEDURAL BACKGROUND

Chris was living with John in Fort Bragg in late April 2009, when Mark, who lived in Southern California, visited them, apparently unannounced. As he was driving into town, he saw John's van and found Chris inside, unattended in his car seat. Mark also found John and Chris were living in squalid conditions in a mobilehome so stacked full of trash—in hoarder mode—that the actual living space was reduced to about four feet by four feet. John had hooked Chris into a harness attached to a leash, staked out in the yard.

---

[1] The guardianship petition named the child as "Cristian Michael [G.]," and much of the record reflects that name. The father's papers named him as "Christian Tyler [G.]," however, and that was the name used on the letters of guardianship. We use the latter spelling.

[2] All undesignated statutory references are to the Probate Code.

The only heater was an open oil-burning stove, which was dangerous for a child. Chris's hair was so matted in the back that it was "unbrushable." Chris's diapers were soaked through to his pajamas, and at another point he was dressed only in a diaper when it was cold outside. Mark bought fresh diapers for Chris during that visit.

Mark noticed that Chris did not respond to hugs and kisses, was withdrawn, and appeared to be developmentally delayed in that he did not yet speak (though he was more than three years old). Although most often withdrawn, Chris also threw tantrums when frustrated.

Mark returned home and talked to his younger brother, Ken G., about Chris's circumstances. They decided to visit again, to help John clean the place and help him build a fence so that Chris would not need to be tethered on a leash. In early May 2009, they arrived together at John's home, bringing food, clothes, and bedding. They offered to help John clean his trailer, but John resisted. They found the stench of human excrement in the trailer intolerable, as John had defecated into a plastic bag and left it in the apparently inoperable toilet. John was using the diapers Mark had bought for Chris to mop up a spill in the bathroom. Raw sewage was leaking from the trailer into the yard near where Chris had been tethered.

Ken and Mark contacted CPS and were told that if a relative was available to take custody of Chris, the matter could be handled through a guardianship petition. Mark filed a petition for temporary guardianship. The petition was heard ex parte due to Mark's fear that John would "run with [the] child" if he became aware of the petition. In supporting declarations, Mark and Ken both described problems with Chris's condition similar to those seen by Mark during his earlier visit. Mark called John "unstable," and Ken also noted that John "has had mental health issues for several years."

Mark described his own family without mentioning his criminal record or history of drug problems: "We have a stable home and my wife is a stay at home mother. I have 4 children and am ready to go to any measure to [assure] the [safety] and welfare of Cristian [sic]."

The petition was granted on May 5, 2009, appointing Mark as temporary guardian. Mark secured a sheriff's standby order when he went to pick up Chris from John at a Fort Bragg hardware store. Peace officers had to be called to accomplish the transfer of custody.

Mark drove Chris to his home in Santa Clarita, more than 500 miles away, where he lived with his wife, Tina G., and four children in a four-bedroom

mobilehome in a large mobilehome park.[3] Chris did not cry or show any emotion upon being separated from John and did not talk during the entire nine-hour trip. After they arrived, Mark and Tina gave Chris a bath and got his hair cut. They took him to a doctor and later had him assessed psychologically, which resulted in a diagnosis of mild autistic disorder.[4] They enrolled him in preschool and got him a therapist.

John objected to the guardianship from the outset, both on grounds that it was unnecessary and that Mark was not a good choice as guardian.[5]

Louis Bates,[6] a probate court investigator,[7] was designated to investigate the matter. During the initial hearing on June 10, 2009, Bates estimated that he would be able to complete his investigation by January 2010.

When John showed up for the June 10 hearing, he claimed to be represented by an attorney whose office was in Crescent City (Del Norte County). The attorney never appeared on John's behalf, however, and Bates would ultimately report that he had seen a letter from the attorney telling John he could not travel to Fort Bragg to represent him. John said the attorney had told him to ask for appointment of a public defender, since he would have a difficult time representing himself in court. No attorney, however, was made available to him. (§ 1470, subd. (a); Cal. Rules of Court, rule 7.1101;[8] see generally Weisz & McCormick, *Abandon Probate Court for Abandoned Children: Combining Probate Guardianship of the Person and Dependency into one Stronger, Fairer Children's Court* (2003) 12 So.Cal. Rev.L. & Women's Stud. 191, 204 (Weisz & McCormick) [attorneys not appointed for parents in probate guardianship proceedings and appointed for children only in court's discretion].)

---

[3] Three of the four children were Tina's biological offspring, ages 18, 14, and 9 years old; one was the couple's biological child, age 15 months. Tina's nine year old also has special needs in that he has Apert syndrome, a disorder of the facial bones, hands, and feet.

[4] According to probate court investigator Louis Bates, one of the chief distinctions between autism and attachment disorder is the late toilet training of autistic children. Given the fact that Chris was still in diapers at age four, Bates accepted the autism diagnosis and rejected the attachment disorder diagnosis.

[5] John initially claimed Mark was trying to get custody of Chris because he and his wife needed additional income in the wake of Tina's loss of her job. However, during the hearing John acknowledged that he "could be wrong," and Mark might not be doing it "for the money."

[6] Bates was referred to as "Dr. Bates" in the record. However, it appears he holds a Ph.D. in communication skills, not an M.D.

[7] The Probate Code differentiates the requirements of investigation based on whether a relative or nonrelative seeks appointment as guardian. If it is a nonrelative, CPS is charged with conducting the investigation. If a relative seeks appointment, a court investigator conducts the investigation. (§ 1513, subd. (a).)

[8] References to rules without further designation are to the California Rules of Court.

Bates conducted an investigation of the circumstances of both John and Mark, and recommended placement of Chris with Mark and Tina. John revealed that Chris had been taken from his mother's home and had been declared a dependent in Del Norte County when he was just six weeks old.[9] At that time John was described as "mentally ill," "out of control," and "threatening project staff."

Chris's mother relinquished her parental rights during the dependency period. John, however, participated actively, and impressed the CASA (court appointed special advocates) advocate with his dedication to parenting Chris. In April 2007, the CASA advocate reported that John and Chris had bonded, that Chris had "a nice crib," and the house was "neat, not cluttered or dirty." Chris was returned to John's custody at the age of 18 months. Since then John and Chris had lived approximately 18 months in Crescent City and the remaining months in Fort Bragg.

From Mark, Bates learned that John had entered the military as a young man, but went AWOL before he was deployed. From that point on, according to Mark, John had psychological problems that resulted in a diagnosis of paranoid schizophrenia. Mark claimed he knew this because their mother had helped John fill out his SSI (supplemental security income) application. Mark said John had previously been on medication, but when he stopped taking it his illness became worse.

John denied being a paranoid schizophrenic and denied that he had ever been on medication for schizophrenia. He acknowledged having posttraumatic stress disorder (PTSD) due to work stress several years after he left the military, but claimed it was under control. He ultimately produced documents showing a PTSD diagnosis and an honorable discharge from the Army. Whatever the correct diagnosis, Bates believed John's own mental illness made him incapable of understanding Chris's needs and following through with services to meet those needs.

According to John, if Chris was developmentally delayed, it was because he was bounced around from one foster home to another during the dependency and never developed the bond with his caregivers that would have fostered normal development. The CASA advocate during the earlier dependency did note that the foster mother did not pick Chris up and hold him

---

[9] Two other referrals were made in Del Norte County, one for general neglect and one for emotional abuse of Chris; they were dealt with as part of the ongoing dependency proceeding. Another allegation of general neglect was lodged against John in Mendocino County for leaving Chris alone and naked from the waist down outside the social services building in Fort Bragg. The incident could not be fully investigated because CPS could not locate John or Chris.

because he supposedly did "not like to be held." There was also a psychologist's report to back up John's claim that Chris suffered from "attachment disorder."

John also told Bates that Mark himself would not make a good guardian because Mark had a relatively serious criminal history, including several "strikes." He also claimed that Mark's efforts to take Chris away from him stemmed from a lifelong sibling rivalry which had often resulted in Mark physically attacking John.

Bates reviewed records showing that Mark had spent approximately nine to 10 years in prison for two robberies, including one involving a weapon, evidently related to Mark's substance abuse (methamphetamine and cocaine). At the time of the guardianship proceedings, however, Mark had been clean and sober for five years.

Mark initially met Tina in a 12-step program. She was reported by Bates and other observers to be a strong and stable influence in Chris's life, with consistent parenting skills and a commitment to raising Chris despite his disability. Tina also had a drug-related criminal record but had been in recovery for nearly six years.

Bates concluded that Mark and Tina had turned their lives around, would provide a good home for Chris, and were committed to providing the long-term care required for a special needs child. Mark and Tina expressed an "absolute commitment to whatever it takes to get the kind of treatment that [Chris] needs." Based on Bates's report, there can be no doubt that Chris thrived in the care of Mark and Tina, who provided necessary and desirable services.

One major thrust of Bates's report was that Chris was more seriously disabled than John would admit, and that John had not, from at least September 2008 to May 2009, provided the necessary services for Chris to flourish. When confronted with mounting evidence that Chris's problem was more serious than he had previously acknowledged, John blamed it on the fact that Mark and Tina had vaccinated him, which John opposed. John, apparently with "[m]any folks," erroneously believed vaccinations could cause autism.

Bates severely criticized John for refusing to accept Chris's true diagnosis, characterizing it as "clearly a form of neglect." Bates concluded that John's denial of the seriousness of Chris's condition would hamper him in parenting Chris with the consistency and focus required to raise a special needs child. Ultimately it was John's reluctance to accept a diagnosis of autism, as well as John's own mental health issues, that led Bates to conclude that a guardianship was necessary.

John showed some reluctance to accept the autism diagnosis during his testimony, but he acknowledged in his documentary submission that Chris's developmental delays "may be a case of Autism," and said he was willing to do whatever was necessary for Chris's future welfare.

As for John's mental health, Bates seemed to conclude that John suffered from a mental disorder more serious than he wanted to admit. Bates described John's dialogue as "rambling" and his reactions during their interviews as "almost hysterical." John went off on "tangents" and had "difficulty in staying focused." Indeed, John demonstrated these tendencies during his testimony in court. Bates concluded that John suffered from a mental illness, and as a result could not properly care for Chris.

A hearing on permanent guardianship was conducted on February 10, 2010. During the hearing, Mark reported in more detail the unsanitary and unhealthful conditions in which he found Chris during his visits in April and May 2009. He also described unsanitary conditions, primarily a dirty crib, he had observed the preceding Thanksgiving in John's home. At that time Mark and Tina bought sheets and other provisions for Chris.

John, however, gave explanations for the conditions that existed in his home, both in testimony at the hearing and in an eight-page document entitled "Objections and Corrections to Guardianship Report of Louis Bates," together with numerous attachments (a total of 60 pages), which he prepared and filed before the hearing. John suggested Mark had greatly exaggerated the problems. He claimed he had neglected to enroll Chris in available services for six months because of difficulties with his living situation and finances, but he was willing to make sure Chris got appropriate medical services in the future.

John also said that Chris failed to respond to Mark's hugs because Chris barely knew Mark, and they had spent very little time together. Also, John had only recently moved into his trailer from a different living arrangement, which helped to explain the boxes stacked up in his trailer. He said he had staked Chris outside only so that Chris would not run off while the neighbor was mowing the lawn with a new red ride-on mower, which had attracted Chris's attention and could present a danger to him. The yard was not yet fenced, but John planned to build a fence. John also explained that Chris had a habit of twisting his finger in the back of his hair, which explained its matted appearance.

John's 60-page submission included many photos of Chris in cleaner and happier circumstances than Mark described; it also included several letters praising his parenting ability. John produced a certificate showing he had

attended parenting classes. Chris's biological mother wrote a letter in his support, saying, "John's a good father" and "Christian is closest to his father, more so than anyone else." One of the letters of support also described Chris as "adorable and vivacious," a description seemingly at odds with Mark's portrayal.

John also presented photographs of a home he had rented in anticipation of regaining custody of Chris. He had signed Chris up for daycare, as well. If Chris were returned to him, he said, he was also willing to comply with any oversight conditions the court might impose. John argued that "a parent is a parent for life"; he had "delivered Christian" at birth and had a "built-in bond" with him. He was proud of his parenting of Chris, and the pain of being separated from his son was obvious.

At the conclusion of the hearing, the court appointed both Mark and Tina as guardians, with a written order filed April 28, and letters of guardianship issued May 21, 2010. No one doubted John's love for Chris, but the court believed Chris needed a guardian due to his special needs and John's limitations. The court found by clear and convincing evidence that returning Chris to John's care would be detrimental to Chris "at this time," while acknowledging that "things might indeed change." The court, in fact, noted that John's evidentiary showing indicated "there's some good here. There's no question about that." The court also was impressed with the "good-looking residence" John had rented for Chris's sake.

John filed a notice of appeal on March 15, 2010. Still unrepresented by counsel, John initially failed to designate the record on appeal, and this court was notified on April 20 that the default had not been cured. We set aside the default and deemed the notice of appeal to have been filed immediately after the letters of guardianship issued (rule 8.104(d)(2)), simultaneously appointing counsel for John on appeal. Counsel then filed a timely designation of the record, and the case proceeded to briefing.

John's counsel filed both an opening brief and a supplemental opening brief. Mark and Tina were served with those briefs and were issued a notice pursuant to rule 8.220(a) on September 2, 2010. A second notice pursuant to rule 8.220(a)(2) was sent on September 28, informing Mark and Tina that the court could decide the appeal on the record, the opening brief, and any oral argument by the appellant. Unfortunately, Mark and Tina, who are not represented by counsel, still did not file a respondent's brief. In these circumstances, we are authorized to proceed to decision based on John's briefing alone. (*Ibid.*)

## DISCUSSION

### I. *Introduction*

■ Central to this appeal is section 1513, subdivision (c), which requires the probate court to refer a guardianship case to CPS whenever it is alleged that a parent is unfit: "If the investigation finds that any party to the proposed guardianship alleges the minor's parent is unfit, as defined by Section 300 of the Welfare and Institutions Code, the case shall be referred to the county agency designated to investigate potential dependencies. Guardianship proceedings shall not be completed until the investigation required by Sections 328 and 329 of the Welfare and Institutions Code is completed and a report is provided to the court in which the guardianship proceeding is pending."

John claims the probate court's failure to refer the case to CPS was not only a statutory violation, but a denial of due process, in part because he was never appointed a lawyer during the guardianship proceedings, to which he would have been entitled had the case been referred to CPS. John further contends he was deprived of the safeguards and presumptions ordinarily accorded a parent facing the loss of custody of his child under the dependency statutes, such as the benefit of family reunification services, periodic reviews of the child's living situation, and a presumption favoring maintenance and reunification of the biological family. In addition, he alleges error in the probate court's failure to order visitation between him and Chris. Finally, he claims none of the errors raised on appeal should be deemed forfeited by failure to object in the probate court. Further urging us to reach the merits, John filed a supplemental opening brief in which he contends the probate court acted in excess of jurisdiction by failing to follow section 1513, subdivision (c).

### II. *Forfeiture*

We begin by rejecting application of the forfeiture principle, and address the merits of John's claim regarding section 1513, subdivision (c). John clearly objected to the manner in which the proceedings were conducted, expressing his belief that no one but CPS could take him to court to deprive him of custody of his child. He said his "rights had been violated," his position as a parent had been "disregarded" in Bates's investigation, and the court proceedings were "illegal." John, not by his own choosing, was not represented by counsel. Considering they came from a self-represented layman possibly suffering from a mental disability, we construe John's remarks as sufficient to preserve for review the court's failure to refer the case to CPS. To the extent John's remarks might be deemed insufficient, we overlook the deficiency. (Cf. *Hale v. Morgan* (1978) 22 Cal.3d 388, 394 [149 Cal.Rptr. 375, 584 P.2d 512].)

Moreover, the duty we discuss is imposed directly on the government by statute and should not require any prompting by the parent to trigger its application. (Cf. *In re Manzy W.* (1997) 14 Cal.4th 1199, 1203 [60 Cal.Rptr.2d 889, 930 P.2d 1255] [lack of objection did not preclude review]; *In re Ricky H.* (1981) 30 Cal.3d 176, 191 [178 Cal.Rptr. 324, 636 P.2d 13].) Finally, the question posed is largely a legal one. Although the underlying facts are disputed, there is no dispute about the procedural history of the case, which is what concerns us. In such circumstances we are more likely to overlook a failure to object. (*Hale v. Morgan, supra*, 22 Cal.3d at p. 394.) For these reasons, we exercise our discretion to address the merits of John's appeal. (*People v. Abbaszadeh* (2003) 106 Cal.App.4th 642, 649 [130 Cal.Rptr.2d 873].)

III. *Differences Between Probate Guardianship and Juvenile Dependency Proceedings*

■ The Probate Code and the Welfare and Institutions Code both contain provisions through which parents may ultimately lose custody of their children. Given the fundamental nature of the parent-child relationship, however, certain safeguards favoring continuance of parental custody have been built into the dependency system. John's argument centers on the fact that corollary provisions are not contained in the Probate Code to protect a parent's interest—and the child's interest—in maintaining the parental home as the preferred placement for the child, so long as it is not contrary to the child's best interests.

The provision here under scrutiny exists at the intersection of the laws traditionally regulating appointment of. guardians for orphans and those intended to assist abused and neglected children. It is, by analogy, a sort of bridge between the two branches of the law. The question ultimately presented by this appeal is whether a child who would normally be dealt with under the juvenile dependency laws can be put into a guardianship with fewer formalities simply because his parent's accuser is a family member who files a guardianship petition in probate court. Put otherwise, the question before us includes whether families have the right to pursue a different judicial path to guardianship of an abused or neglected child than would be pursued if the abuse or neglect came to the county's attention via reports from outsiders. We conclude that a separate path is not legally open to them. They must cross the bridge into juvenile court.

Understandably, Mark expressed the desire to keep Chris out of the foster home system. But the involvement of CPS does not inevitably mean an out-of-home placement with strangers. If the juvenile court determines it is not safe to send the child home, it may order the child "placed in the assessed

home of a relative . . . ."[10] (Welf. & Inst. Code, § 319, subd. (f); see also Welf. & Inst. Code, § 361.45 [emergency placement with relative].) With the dependency law's focus on the child's safety, however, the home must be "assessed" for the child's protection.[11] Aside from that necessary precaution, family members have a statutory preference for placement of the child. (Welf. & Inst. Code, §§ 319, subds. (d)(2), (f)(2) & (3), 361.3.)

A. *Parental rights and emphasis on reunification under dependency statutes*

■ The dependency statutes, a creature of the 20th century (see Stats. 1909, ch. 133, § 1(7), p. 213), are intended to rescue and protect children suffering physical or emotional abuse or parental neglect. But because the parent accused of abuse or neglect also has important rights at stake, the dependency laws attempt to strike a balance between protecting the child and giving the parent a fair opportunity to rectify the problems in the home.

We have previously recognized that " 'the interest of a parent in the companionship, care, custody, and management of his children is a compelling one, ranked among the most basic of civil rights [citations] . . . .' " (*In re James R.* (2007) 153 Cal.App.4th 413, 428 [62 Cal.Rptr.3d 824] (*James R.*); see also, e.g., *Santosky v. Kramer* (1982) 455 U.S. 745, 753 [71 L.Ed.2d 599,

---

[10] Under the dependency statutes, if a willing relative is deemed "suitable," the child may be released to him or her. (Welf. & Inst. Code, § 309, subd. (d)(1).) The standards used to determine suitability are the same as those used for licensing foster family homes. The determination of suitability must "include an in-home inspection" and "a consideration of the results of a criminal records check" of the relative "and other adults in the home." (*Ibid.*)

[11] If an adult in the home has a criminal record, the director of the agency has the discretion to declare an exemption allowing the relative to maintain custody in certain circumstances. (Welf. & Inst. Code, § 309, subd. (d)(4); Health & Saf. Code, § 1522.) However, the child must not be placed in the home without "substantial and convincing evidence to support a reasonable belief that the person with the criminal conviction is of such good character as to justify the placement and not present a risk of harm to the child." (Welf. & Inst. Code, § 309, subd. (d)(4).)

In this case Chris was sent home with an ex-convict, where drug addiction was the root of the prior criminal activity, without any county employee having conducted an assessment of the temporary guardian or the home. So far as we can tell from the record, it is entirely possible that the placement was made without a criminal history check. Mark and Tina's home was not visited until a Los Angeles County probate court investigator evaluated it on November 6, 2009, as a "courtesy" to the Mendocino County court investigator's office. Thus, Chris spent some six months in the home of ex-convicts and admitted drug addicts before an evaluation of their home ever took place.

That said, our concerns should not be read as maligning the character of Mark or Tina G. It appears from the record that so far they have done a remarkable job of rescuing Chris from a home where he appears to have been in poor and possibly declining care. That the chosen guardians in this case may have acted properly and in Chris's best interest does not, however, alleviate the concern that in similar circumstances a less savory guardian might be appointed without the safeguards provided under the juvenile court law.

102 S.Ct. 1388]; *Stanley v. Illinois* (1972) 405 U.S. 645, 651 [31 L.Ed.2d 551, 92 S.Ct. 1208].) A parent's interest in maintaining a parent-child relationship is an extremely "important interest" (*Lassiter v. Department of Social Services* (1981) 452 U.S. 18, 27 [68 L.Ed.2d 640, 101 S.Ct. 2153]), and termination of that right by the state must be viewed as a drastic remedy "to be applied only in extreme cases" (*In re Victoria M.* (1989) 207 Cal.App.3d 1317, 1326 [255 Cal.Rptr. 498]).

■ Although a guardianship does not technically terminate a parent's rights, it does suspend them indefinitely, and it often leads to practical or legal termination of the parent-child relationship, or both. (*Guardianship of Stephen G.* (1995) 40 Cal.App.4th 1418, 1426–1427 [47 Cal.Rptr.2d 409] (*Stephen G.*) ["As a practical matter . . . many guardianship orders will forever deprive the parent of a parental role with respect to the affected child."].)

■ In the dependency statutes the Legislature has also declared its objective of "removing the minor from the custody of his or her parents only when necessary for his or her welfare or for the safety and protection of the public." (Welf. & Inst. Code, § 202, subd. (a).) Furthermore, "[i]f removal of a minor is determined by the juvenile court to be necessary, reunification of the minor with his or her family shall be a primary objective" (*ibid.*), reinforcing the Legislature's "intent to encourage the continuity of the family unit . . ." (Welf. & Inst. Code, § 16500.5, subd. (a)). Indeed, we have described the juvenile laws as "rigorously protective of the parent's presumptive rights" during the initial phases of a dependency proceeding. (*Stephen G., supra,* 40 Cal.App.4th at pp. 1428, fn. 5, 1429–1430.)

To that end, when a child is initially turned over to CPS, the social worker must not only investigate the circumstances of alleged abuse or neglect, but must also "attempt to maintain the child with the child's family through the provision of services." (Welf. & Inst. Code, § 309, subd. (a).) Throughout the initial phase of the dependency process, the focus remains on maintenance or reunification of the family to the fullest extent possible without jeopardizing the child's physical or emotional safety.[12] (Welf. & Inst. Code, § 319, subds. (b), (d)(1); *In re Nolan W.* (2009) 45 Cal.4th 1217, 1228 [91 Cal.Rptr.3d 140,

---

[12] At the initial hearing in juvenile court, the social worker must report to the court "why the child has been removed from the parent's physical custody," and "the need, if any, for continued detention." (Welf. & Inst. Code, § 319, subd. (b).) He or she must also identify "available services" that "could facilitate the return of the child to the custody of the child's parents." Before the child may be detained, the court must determine that "continuance in the parent's. . . home is contrary to the child's welfare." (*Ibid.*) It must also make a finding "whether reasonable efforts were made to prevent or eliminate the need for removal of the child from his or her home, . . . and whether there are available services that would prevent the need for further detention." (Welf. & Inst. Code, § 319, subd. (d)(1).) Continued out-of-home

203 P.3d 454]; *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 253 [19 Cal.Rptr.2d 698, 851 P.2d 1307].) The juvenile court must "order services to be provided as soon as possible to reunify the child and his or her family if appropriate." (Welf. & Inst. Code, § 319, subd. (e).)

■ In deference to the parental rights at stake, the dependency statutes include "highly specific *substantive* standards" governing the removal of children from their parents' custody. (*Stephen G., supra,* 40 Cal.App.4th at p. 1429.) But the protection of the parent-child relationship is not intended solely for the benefit of the parent. "[T]he child's interest in the parent-child relationship is at least as important and as worthy of protection as the parent's interest." (*James R., supra,* 153 Cal.App.4th at p. 429.) Indeed, " ' "[c]hildren have strong emotional ties to even the 'worst' of parents. [Citations.]" ' " (*Ibid.*)

This preference for family continuity and reunification is absent in the context of a guardianship proceeding. (*Stephen G., supra,* 40 Cal.App.4th at p. 1429; *Guardianship of Kaylee J.* (1997) 55 Cal.App.4th 1425, 1432 [64 Cal.Rptr.2d 662] (*Kaylee J.*).) There can be no question that "creation of a guardianship under California law offers fewer protections for parental interests than dependency proceedings or proceedings to terminate parental rights." (*Stephen G., supra,* 40 Cal.App.4th at p. 1429.) In fact, John's parental rights could be terminated after Chris has been in Mark's physical and legal custody for two years, with no greater showing than that "the child would benefit from being adopted by his or her guardian." (§ 1516.5, subd. (a)(2) & (3); see *Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1131, fn. 13 [90 Cal.Rptr.3d 701, 202 P.3d 1089]; *In re Charlotte D.* (2009) 45 Cal.4th 1140, 1142 [90 Cal.Rptr.3d 724, 202 P.3d 1109].)

### B. *Historical reasons for different treatment*

Much of the difference between probate guardianships and juvenile court proceedings can be explained historically. Probate courts adjudicated guardianship as part of the disposition of a decedent's estate long before the juvenile dependency statutes came into being. (Weisz & McCormick, *supra,* at pp. 194–195.) Guardians may be appointed for many reasons that do not involve a contested removal of a child from his or her parental home. For instance, a guardian may be appointed when both parents are deceased or their whereabouts unknown, when a sole parent is incarcerated, or when the parent voluntarily relinquishes the child to another person. Because probate cases historically involved orphans or children of absent parents, guardianship law developed no counterpart to the juvenile law's focus on maintaining

placement of the child after jurisdiction has been established must be supported by clear and convincing evidence. (Welf. & Inst. Code, § 361, subd. (c).)

or reunifying the child with the parent. And because the cases were often uncontested, the same procedural safeguards—such as appointment of counsel—were not statutorily provided.

### C. Investigations under probate guardianship law versus dependency law

■ As a result of these two separate paths on which the law developed, there are currently a number of important differences between proceedings in juvenile court and guardianship proceedings in probate court. For instance, in dependency cases CPS must prepare a social study for the court in a format dictated by statute, including a case plan for placement of the child that must be formulated within 60 days after initial removal of the child from the home and updated at least once every six months. (Welf. & Inst. Code, §§ 358, subd. (b), 358.1, 16501.1, subds. (a), (b) & (d); rule 5.690.)

Under the Probate Code, there is no mandatory investigation at all, but rather it is discretionary with the court. (§ 1513, subd. (a).) If an investigation is conducted, the Probate Code focuses on the proposed guardian's qualifications and the child's needs, making no mention of the parent's circumstances or any preference for maintaining the family unit. (§ 1513, subd. (a)(1) & (2).) The parent may be asked about future plans for a "stable and permanent home for the child," but even that inquiry may be waived by the court in the case of a relative guardianship. (§ 1513, subd. (a)(4).)

Although the probate court investigatory report in this case appears to have been rather thorough and well-balanced, the Probate Code is far less specific as to what information is required in such a report, especially with respect to preexisting family home life, nor are timelines imposed for completion of the investigation comparable to those in juvenile court. (Compare Prob. Code, § 1513 with Welf. & Inst. Code, §§ 352, subd. (b), 358, 358.1, 360, 16501.1.)

### D. Appointment of counsel

■ Beyond depth and timeliness of the investigation, the dependency process is procedurally more protective of parental rights than are probate guardianship proceedings. Indigent parents are represented by attorneys at government expense whenever "the child has been placed in out-of-home care, or the petitioning agency is recommending that the child be placed in out-of-home care," unless they make "a knowing and intelligent waiver." (Welf. & Inst. Code, § 317, subd. (b).) Had the case proceeded through the dependency channel, an attorney also would have been appointed to represent Chris. (Welf. & Inst. Code, § 317, subd. (c).)

On the other hand, counsel is not provided for adult litigants at public expense in probate guardianship proceedings, nor is counsel appointed for the

child, except in the court's discretion. (§ 1470, subd. (a); Weisz & McCormick, *supra*, at p. 204.) Here, counsel was not appointed for either John or Chris in the court below.

### E. *Reunification services*

■ In addition, if the juvenile court removes a child from a parent's custody, it must, with some exceptions, order social welfare services for the child and parents,[13] including "counseling or other treatment services," to facilitate reunification of the family.[14] (Welf. & Inst. Code, § 361.5, subd. (a)(3) & (4).) One exception is if the parent "is suffering from a mental disability . . . that renders him or her incapable of utilizing those services." (§ 361.5, subd. (b)(2).) No such finding was made in this case, nor was it a subject of inquiry under the Probate Code.

Reunification services are time limited (see Welf. & Inst. Code, §§ 361.5, 366.21, 366.22, 16507), but it cannot be doubted that they frequently result in a child being returned to the parents. Indeed, "[i]t is difficult, if not impossible, to exaggerate the importance of reunification in the dependency system." (*In re Luke L.* (1996) 44 Cal.App.4th 670, 678 [52 Cal.Rptr.2d 53].) A guardianship may be ordered by the juvenile court without reunification efforts for a qualified parent only if the parent waives reunification services and agrees to the guardianship. (Welf. & Inst. Code, § 360, subd. (a).)

On the other hand, no provision of law allows the probate court to order reunification services for the parent and child in the context of a probate guardianship. (*Kaylee J., supra*, 55 Cal.App.4th at p. 1432.) Thus, not only are parental rights not expressly protected in probate guardianship proceedings, but there is no mechanism available to the probate court to nurture and support the parent-child relationship, even assuming it believed such efforts might result in providing a suitable home for the child.

---

[13] Reunification services must be provided "to the child and the child's mother and statutorily presumed father or guardians." Services may also be ordered "for the child and the biological father, if the court determines that the services will benefit the child." (Welf. & Inst. Code, § 361.5, subd. (a).) It appears John would be a presumed father under Family Code section 7611, subdivision (d).

[14] Services to be considered include "case management, counseling, emergency shelter care, emergency in-home caretakers, out-of-home respite care, teaching and demonstrating home-makers, parenting training, transportation, and any other child welfare services authorized by the State Department of Social Services . . . ." (Welf. & Inst. Code, § 319, subd. (d)(1).) Services may include financial assistance with travel expenses for purposes of visitation, the lack of which posed a problem for John. (*In re L.M.* (2009) 177 Cal.App.4th 645, 650 [99 Cal.Rptr.3d 350].)

### F. *Continuing jurisdiction*

 The potential benefits of a CPS referral continue over the long term. Periodic reviews are conducted during the reunification period, which incorporate substantive standards protective of parental rights and family continuity. (E.g., Welf. & Inst. Code, §§ 361, subds. (c) & (d), 361.5, subd. (a), 366, subd. (a)(1)(E) & (2), 366.1, subd. (d), 366.21, subds. (e) & (f).) The parent's ability to raise the child is regularly reevaluated, as is the viability of the out-of-home placement and other options, to determine where the child should be permanently placed, guided by the child's best interest. (Welf. & Inst. Code, §§ 361.5, subd. (a), 366.21, subds. (c), (e) & (f), 366.22, subds. (a) & (b).)

If reunification services are declined by the parent or are unsuccessful, the juvenile court may, as part of the permanent plan, establish and supervise a legal guardianship. (Welf. & Inst. Code, §§ 360, subd. (a), 366.25, subd. (a)(3), 366.26, 366.3.) However, a guardianship established by the juvenile court may remain subject to the court's oversight through regular status reviews. (Rules 5.620(d), 5.695(b)(3), 5.740(a)(3).) The probate court, too, technically retains jurisdiction, as the guardian is still subject to the "regulation and control of the court." (§ 2102.) The only requirement in probate guardianships, however, is a written annual report by the guardian. (§ 1513.2.)

Whether Chris ultimately remains in Mark and Tina's care or is returned to John, continued monitoring of his well-being, which would be more thorough if CPS were involved, could well prove to be an important part of the future care of this child.

## IV. *This Case is Governed by Section 1513, Subdivision (c)*

Returning to the question whether a case of parental abuse called to the court's attention by family members may be pursued through a different process than a similar case discovered by other means, we think the Legislature's answer is clear and straightforward—there is no second path.

### A. *A referral is mandated under section 1513, subdivision (c), whenever a party alleges that a child falls within the purview of the dependency laws*

 A referral to CPS "shall" be made under section 1513, subdivision (c), whenever a parent is accused of unfitness "as defined by Welfare and Institutions Code section 300." Welfare and Institutions Code section 300

does not actually include or define the term "unfit" parent,[15] but rather describes the situations that bring a minor within the dependency jurisdiction of the juvenile court.[16] (*Kaylee J., supra,* 55 Cal.App.4th at p. 1431, fn. 2.) We therefore construe the phrase "the minor's parent is unfit" in section 1513, subdivision (c), as applying to any parent whose child allegedly falls within the jurisdiction of the juvenile court under Welfare and Institutions Code section 300.[17]

The statute is phrased in mandatory, not permissive, terms—i.e., "shall," not "may." The legislative history also supports the view that CPS referral is "require[d]," not optional.[18] Thus, the referral is clearly obligatory, not permissive.[19] Despite its obligatory nature, Weisz and McCormick report that

---

[15] From its inception until 1988, the dependency law did contain the phrase "unfit place," including within the jurisdiction of the juvenile court any minor "[w]hose home is an unfit place for him by reason of neglect, cruelty, depravity, or physical abuse of either of his parents, or of his guardian or other person in whose custody or care he is." (Welf. & Inst. Code, former § 300, subd. (d), repealed by Stats. 1987, ch. 1485, § 3, p. 5603; see, e.g., Stats. 1909, ch. 133, § 1, subd. (7), p. 213; Stats. 1976, ch. 1068, § 6, p. 4759.) The version adopted in 1987 and operative January 1, 1989, contained no reference to "unfit" place or "unfit" parent. (Stats. 1987, ch. 1485, § 4, pp. 5603–5606, 5644.) More recent amendments have not reinstated the reference to an "unfit place."
· The "unfit" parent language was added to section 1513 in 1986, when the "unfit place" language still appeared in the dependency statute. (Stats. 1986, ch. 1017, §§ 1, 2, pp. 3514–3515.) That statute has continued to retain the "unfit" parent language, even though that term has been removed from Welfare and Institutions Code section 300.

[16] A child comes within the jurisdiction of the juvenile court if he or she "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, . . . or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (Welf. & Inst. Code, § 300, subd. (b).) The same section, subdivision (c) provides for juvenile court jurisdiction if "[t]he child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian or who has no parent or guardian capable of providing appropriate care." (*Id.,* subd. (c).)

[17] *Kaylee J.* was a case in which unfitness was not alleged. (*Kaylee J., supra,* 55 Cal.App.4th at pp. 1427–1428.) In dictum, however, it distinguished that circumstance from cases of abuse or neglect: "[W]here the proposed ward in a probate guardianship proceeding fits within the description of a dependent child under the Welfare and Institutions Code, the case shifts to a completely different track." (*Id.* at p. 1431.)

[18] The Summary Digest notes, "This bill would require referral of the case to the county agency designated to investigate potential dependencies if the investigation finds that any party to the proposed guardianship alleges that the minor's parent is unfit, as defined, thus imposing a state-mandated local program." (Legis. Counsel's Dig., Assem. Bill No. 3327 (1985–1986 Reg. Sess.) 4 Stats. 1986, Summary Dig., ch. 1017, p. 365.)

[19] We review matters of statutory construction de novo and factual findings for substantial evidence. (*In re David H.* (2008) 165 Cal.App.4th 1626, 1633 [82 Cal.Rptr.3d 81].)

section 1513, subdivision (c), is honored "more in the breach than the observance," thereby rendering the protection contemplated by that section "virtually meaningless." (Weisz & McCormick, *supra*, at p. 203.) Their dismal assessment of compliance includes a claim that probate guardianship investigators estimate 80 percent of their cases involve parental unfitness, yet they "rarely make referrals to CPS." (*Ibid.*)

B. *The court was required to make a referral to CPS because Mark's statements regarding Chris's circumstances amounted to an allegation that John was an unfit parent*

Unfortunately, the statute does not specify which government actor "shall" make the referral to CPS. The just-quoted statement by Weisz and McCormick may imply that the referral is typically made by the investigator himself or herself. Also, the referral requirement is triggered if the "investigation finds" allegations of parental unfitness, which may suggest that the investigator is charged with making the determination. (§ 1513, subd. (c).)

But we cannot believe the Legislature intended to grant such unfettered discretion to the investigator. Nor do we believe an express "finding" must be made by the investigator that unfitness is involved before a referral is mandated. Rather, the referral requirement is triggered by any party's *allegation* amounting to an accusation of unfitness. This is in part a legal conclusion which should be made by a judge, not an investigator.

■ We hold that the probate court, having received information constituting an allegation of unfitness, whether from the investigator's report or from the pleadings themselves, is directly obligated to order the case referred to CPS. This is the manner in which the court proceeded in *Tracy A. v. Superior Court* (2004) 117 Cal.App.4th 1309 [12 Cal.Rptr.3d 684], where the probate court referred the case to CPS for investigation after the probate investigator's report was filed. (*Id.* at p. 1312 & fn. 2.) It held the guardianship petition in abeyance pending the outcome of the investigation, even though it was the mother's parents who had petitioned for guardianship. (*Id.* at p. 1312.)

In the present case, for instance, it was obvious from the beginning that Mark was alleging that John was neglecting Chris. Mark's petition alleged that John's "living arrangement [was] unsuitable for [a] child" and was an "unsafe environment for [a] child." These charges and the additional allegations in his petition and during the investigation constituted a claim that John

was "unfit" because they amounted to an allegation that Chris fell within the purview of Welfare and Institutions Code section 300, subdivisions (b) and (c).[20]

 Yet, in seeming contradiction, section 1513, subdivision (a), instructed the court to refer the case to a court investigator since the person seeking guardianship was a relative. Considered in the statute's overall context, that subdivision must give way to subdivision (c)[21] when there is an allegation of parental unfitness. Subdivision (c), then, is an exception to subdivision (a)'s directive to refer relative guardianship investigations to the court investigator, not the other way around.

Chris's case should have been referred to CPS for further investigation in compliance with Welfare and Institutions Code sections 328 and 329, which would have required CPS to determine whether dependency proceedings should be initiated.[22] If the investigation were to result in Chris being adjudged a dependent of the court, the juvenile court then would have exclusive jurisdiction to decide all custody issues. (Welf. & Inst. Code, § 304; *Kaylee J., supra*, 55 Cal.App.4th at pp. 1431–1432.)

 The Probate Code is intended to work hand in hand with the dependency laws as a cohesive statutory structure that aims to subject all cases alleging parental unfitness to the rigors of a dependency investigation. Accordingly, probate courts are expected to send those cases involving abuse or neglect to the county's dependency agency for investigation and provision of services. The statutory scheme appears calculated to ensure that all claims of parental child abuse and neglect are investigated by the same agency—and subjected to the same standards. If the investigation suggests the child must be removed from the parental home, then the interplay of the statutes strongly

---

[20] Here, in fact, there had been preexisting reports that John was neglecting Chris, but CPS had not followed up because it was unable to locate them. (See fn. 7, *ante*.)

[21] References to subdivisions, without designation of statute, are to section 1513.

[22] Welfare and Institutions Code section 328 requires the CPS social worker to "immediately make any investigation he or she deems necessary to determine whether child welfare services should be offered to the family and whether proceedings in the juvenile court should be commenced. If the social worker determines that it is appropriate to offer child welfare services to the family, the social worker shall make a referral to these services . . . ." In addition, the social worker is required to interview any child age four or older who has "been removed to a foster home" in order to ascertain "the child's view of the home environment." If dependency proceedings are commenced, the social worker "shall include the substance of the interview" in written reports submitted to the court. (*Ibid.*)

Welfare and Institutions Code section 329 allows a social worker three weeks within which to initiate proceedings in juvenile court. If a petition is not filed, the social worker must "endorse upon the affidavit of the applicant his or her decision not to proceed further and his or her reasons therefor . . . ."

suggests that reunification services are to be offered to the family. We cannot justify the probate court's failure to request a dependency evaluation in this case.

### C. *The referral to CPS was mandatory, not merely directory*

But even if the CPS referral was obligatory, that alone does not mean the failure to adhere to that duty calls for automatic reversal. "A statutory requirement may impose on the state a duty to act in a particular way, and yet failure to do so may not void the governmental action taken in violation of the duty. [Citations.] This distinction is generally expressed in terms of calling the duty 'mandatory' or 'directory.' '[T]he "directory" or "mandatory" designation does not refer to whether a particular statutory requirement is "permissive" or "obligatory," but instead simply denotes whether the failure to comply with a particular procedural step will or will not have the effect of invalidating the governmental action to which the procedural requirement relates.' " (*In re Richard S.* (1991) 54 Cal.3d 857, 865 [2 Cal.Rptr.2d 2, 819 P.2d 843]; see also *California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1145 [43 Cal.Rptr.2d 693, 899 P.2d 79] [time limit for board's decision was directory]; *International Medication Systems, Inc. v. Assessment Appeals Bd.* (1997) 57 Cal.App.4th 761, 765 [67 Cal.Rptr.2d 394] [statute requiring 45 days' notice of hearing was mandatory]; *Bayside Auto & Truck Sales, Inc. v. Department of Transportation* (1993) 21 Cal.App.4th 561, 565–566 [26 Cal.Rptr.2d 109] [department had no mandatory duty to sell excess land].)

" ' "In the absence of express language, the intent must be gathered from the terms of the statute construed as a whole, from the nature and character of the act to be done, and from the consequences which would follow the doing or failure to do the particular act at the required time. [Citation.] When the object is to subserve some public purpose, the provision may be held directory or mandatory as will best accomplish that purpose . . . ." ' " (*Chrysler Corp. v. New Motor Vehicle Bd.* (1993) 12 Cal.App.4th 621, 629 [15 Cal.Rptr.2d 771], quoting *Morris v. County of Marin* (1977) 18 Cal.3d 901, 909–910 [136 Cal.Rptr. 251, 559 P.2d 606].)

The Supreme Court has also suggested, however, that whether a statutory requirement imposed upon a court is "mandatory" or "directory" depends upon whether the requirement "provide[s] protection or benefit to those individuals [affected by the requirement] or was instead simply designed to serve some collateral, administrative purpose." (*People v. McGee* (1977) 19 Cal.3d 948, 963 [140 Cal.Rptr. 657, 568 P.2d 382].) In the dependency context, for instance, the requirement of providing parents with a copy of the status report at least 10 days before the hearing was deemed to be mandatory

because it was intended to ensure the due process rights of the parties, not simply to allow for orderly conduct of the adjudicative process. (*Judith P. v. Superior Court* (2002) 102 Cal.App.4th 535, 552–553 [126 Cal.Rptr.2d 14].)

Under the foregoing standards, we hold that the CPS referral was mandatory. As discussed above, the referral to CPS would clearly benefit parents accused of neglect, and ultimately it is intended for the benefit and protection of abused and neglected children. It is not simply an administrative task. And the requirement of a CPS investigation implicates more than simply. the identity of the investigator. The CPS investigation serves to potentially open up to the family an array of services aimed at keeping the parent-child home intact. Given the consequences of the failure to make the required referral, we conclude the duty itself was mandatory—and the guardianship order entered without that referral invalid.

## V. *Harmless Error Analysis*

John asserts that the error in this case was prejudicial and requires reversal. We agree, under any applicable standard of prejudice.

### A. *Reversible per se*

*Judith P. v. Superior Court, supra,* 102 Cal.App.4th 535, first held that the social worker had a mandatory duty to provide a status report to a mother threatened with termination of reunification services at least 10 days before the hearing, and then held the error was reversible per se, unless a continuance was granted or the party expressly waived her right to timely notice. (*Id.* at pp. 553–558.) Because the error occurred prior to the hearing, the court analogized the deficiency to structural error in a trial. (*Id.* at pp. 554–557.) Of course, if we follow that analysis, the error in this case, which also occurred prior to the guardianship hearing and affected the entire proceeding, would require automatic reversal and remand.

### B. *Harmless error under* Manzy W.

#### 1. Manzy W. *suggests remand is unnecessary if the purpose of the mandatory duty has been otherwise fulfilled*

Even violation of a "mandatory" duty does not always make reversal and remand "automatic." (*In re Manzy W., supra,* 14 Cal.4th at pp. 1204–1207 & fn. 2.) For instance, *Manzy W.* involved a juvenile court's failure to declare a wobbler offense either a misdemeanor or a felony in accordance with Welfare and Institutions Code section 702. The court decided the duty to express that decision on the record was mandatory. (14 Cal.4th at p. 1207.) It nevertheless

held that a remand was not "automatic," but rather depended on whether the record otherwise reflected the exercise of discretion to declare the offense a felony. (*Id.* at p. 1209.) We read *Manzy W.* as holding that even a lack of literal compliance with a mandatory duty may be harmless error, so long as the record affirmatively reflects that the protections intended to be afforded to private parties through the exercise of that duty has been otherwise provided. Even so, we find reversal and remand necessary.

### 2. *The Bates report did not fulfill the same functions as a CPS referral*

Adapting the *Manzy W.* approach to the present circumstances, we conclude that a remand might not be necessary—and any deviation from the referral process harmless—if the ends to be accomplished by the referral were otherwise fulfilled. Using that analysis, we cannot say that the purpose of section 1513, subdivision (c) was fulfilled in an alternative manner by the probate court. Of course, an investigation was conducted by Bates, and we have no reason to think he was less qualified to make a sound recommendation than a CPS social worker would have been.

But the referral to CPS entails more than just an investigation. It also holds out the hope to the family that they can remain intact through the provision of appropriate social services. No corollary services are provided in the probate system. And if the child is declared a dependent and removed from the home, the dependency statutes give the parent the benefit of a period of reunification, with presumptions in the decisionmaking process favoring reunification of the family if possible without jeopardizing the child's welfare. (E.g., Welf. & Inst. Code, §§ 309, subds. (a) & (c), 319, subds. (b), (c) & (d), 361, subds. (c) & (d), 361.5, subd. (a), 366, subd. (a)(1)(E) & (2), 366.1, subd. (d), 366.21, subds. (e) & (f).)

A referral to CPS could have resulted, for example, in provision of a current mental health evaluation for John, as well as services, such as parenting classes geared specifically to raising disabled children, that might have made him more capable of supporting Chris's needs. Had John agreed to avail himself of such help (as he appeared willing to do), he might have been able to regain custody of Chris. But even assuming the ultimate return of custody to John is unlikely, the benefits of a juvenile dependency referral are potentially weighty enough to require referral and investigation, even when the parent's circumstances seem unlikely to allow for permanent retention of custody in his or her home. Broadly speaking, any case that does not fall within an exception under Welfare and Institutions Code section 361.5, subdivision (b), would likely involve prejudicial error if the CPS referral were not made as mandated.

### C. *The error was also prejudicial under the miscarriage of justice standard*

Even if the statute were merely directory and the resulting order merely voidable, we would reverse the court's permanent guardianship order in the present case. Applying the state miscarriage of justice standard, forgoing a referral to juvenile authorities was prejudicial. (Cal. Const., art. VI, § 13.) Given that John actively contested the guardianship and insisted that he was capable of caring for Chris, we cannot reasonably deem the lack of CPS referral a harmless error.

John argues that he has been prejudiced by the court's failure to refer the case to CPS because a standard less favorable to natural parents is applied in probate court, specifically that a probate court may appoint a guardian of the person of a minor any time "it appears necessary or convenient" (§ 1514, subd. (a)), a substantive standard that he claims is far less rigorous than the standards applied under the juvenile dependency law. It is true that the court was required to and did make a finding on clear and convincing evidence that returning Chris to John's care would be "detrimental to the child." (Fam. Code, § 3041, subds. (a) & (b); Prob. Code, § 1514, subd. (b); see *Guardianship of Jenna G.* (1998) 63 Cal.App.4th 387, 394 [74 Cal.Rptr.2d 47]; *Stephen G., supra,* 40 Cal.App.4th at pp. 1423–1425.) Still, this is a less demanding standard than would have been applied in dependency proceedings.[23]

Moreover, given that John would not have been categorically excluded from receiving reunification services in dependency proceedings (e.g., Welf. & Inst. Code, § 361, subd. (b)(2)), the lack of provision of such services alone is a sufficient detriment to warrant reversal and remand in this case. We cannot say that providing John with reunification services would have been futile. There was no allegation that John intentionally abused Chris, only that his mental health impaired him from taking proper care of the child. The government must provide reunification services to mentally ill parents who

---

[23] Under the dependency laws, before ordering a child removed from a parent's home beyond a brief initial period, the court must find by clear and convincing evidence that there "is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor" if left in the parent's home, "and there are no reasonable means by which the minor's physical health can be protected without removing the minor." (Welf. & Inst. Code, § 361, subd. (c)(1).) Several other similarly specific findings may warrant removal, such as that the child "is suffering severe emotional damage, as indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior toward himself or herself or others, and there are no reasonable means by which the minor's emotional health may be protected without removing the minor from the physical custody of his or her parent or guardian." (*Id.,* subd. (c)(3).) Thus, the findings required under the dependency statutes are far more specific than the more flexible "detrimental to the child" standard of Family Code section 3041.

have not been proven "incapable of utilizing" such services.[24] (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1790 [42 Cal.Rptr.2d 200]; *In re Victoria M., supra*, 207 Cal.App.3d at p. 1320.) Had mental health services been provided to John as part of CPS's involvement, there is a reasonable probability that he ultimately could have regained custody of Chris.

Finally, neither John nor Chris was represented by counsel in the guardianship proceedings. Since the probate court had granted temporary guardianship to Mark and was entertaining permanent guardianship proceedings, both John and Chris would have been entitled to appointed counsel had the case been referred for a dependency investigation. (Welf. & Inst. Code, § 317, subds. (b) & (c).)

We cannot ignore the role that an attorney might have played on John's behalf if one had been provided. As matters stood, Bates was allowed to speculate about possible diagnoses of mental illness that might be attached to John based on hearsay and outdated medical records.[25] An attorney could have requested a current psychological evaluation for John, encouraged him to enroll in parenting classes, and helped him to present the documentary evidence in his favor early in the process. John's own inability to present an organized set of documents seemed to count against his parenting prospects in Bates's eyes.[26]

In addition, John's rambling narrative style during his testimony—which was conducted by the court with open-ended questions—hurt him on the merits, as Bates used it to confirm his view that John could not focus sufficiently to properly parent Chris. A lawyer could have presented John's testimony in question and answer form so that it would have been more coherent. Had John been assisted by counsel it might not have been so tempting or so easy to write him off as hopelessly mentally ill, disorganized, and "rambling."

Based on the foregoing considerations, we cannot deem the probate court's failure to refer the case to CPS to be harmless error. The order granting Mark and Tina permanent guardianship of Chris must be vacated, the letters of

---

[24] To establish such an exception, the county must present "competent evidence from mental health professionals . . . that, even with the provision of services, the parent is unlikely to be capable of adequately caring for the child." (Welf. & Inst. Code, § 361.5, subd. (c).) Yet, in this case there was no professional assessment of John's health history or his current mental health status to determine his ability to utilize reunification services.

[25] Our discussion should not be read as denigrating Bates's work. Within the confines of the information available to him, he appears to have done a comprehensive and credible assessment of Chris's circumstances.

[26] John's final "Objections and Corrections" filing was actually quite well organized and, in the court's words, "clear and very understandable."

guardianship revoked, and a referral to CPS must be made before any further disposition of the guardianship petition. The order of temporary guardianship shall remain in force pending further proceedings.

Our conclusion on the statutory issue makes it unnecessary to address the due process or jurisdictional issues raised by John, including the claimed "illusory" order issue highlighted in John's counsel's postbriefing letter. Because we remand on other grounds, we also will not address the visitation issue, an issue that we trust will be addressed on remand.

## DISPOSITION

The order appointing Mark and Tina G. as permanent guardians for Chris G. is reversed and the letters of guardianship are ordered revoked. The case is remanded for compliance with section 1513, subdivision (c).

Haerle, Acting P. J., and Lambden, J., concurred.

On May 31, 2011, the opinion was modified to read as printed above.