Filed 6/26/13  In re D.P. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re D.P. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E057459 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J232226 & J230415) |
| v. | OPINION |
| J.P. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Cheryl C. Kersey, Judge.  Affirmed.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant J.P.

Lori A. Fields, under appointment by the Court of Appeal, for Defendant and Appellant K.R.

No appearance for Minors.

1

Jean-Rene Basle, County Counsel, Jamila Bayati, Deputy County Counsel, for Plaintiff and Respondent.

K.R. (Mother) and J.P. (Father) appeal the termination of their parental rights. (Welf. & Inst. Code, § 366.26.)[1] We first addressed this case when Father appealed from the juvenile court's denial of his request to change a court order. (§ 388.) (*In re D.P.* (Aug. 28, 2012, E054723) [nonpub. opn.].) In that prior case, we affirmed the juvenile court's order. (*Id.* at p. 26.) In the instant case, Mother raises three contentions. First, Mother asserts the juvenile court erred by not applying the parent-child bond exception to terminating parental rights. (§ 366.26, subd. (c)(1)(B)(i).) Second, Mother asserts the juvenile court erred in determining the best interests of the child, D.P., because there was no evidence presented concerning D.P.'s feelings about Mother. Third, Mother asserts the juvenile court erred in terminating parental rights to Mother's second child, M.G., due to violations of the Indian Child Welfare Act (ICWA). Father joins in Mother's contentions. We affirm the judgment.

**FACTUAL AND PROCEDURAL HISTORY**

I.     PRIOR APPELLATE OPINION

The facts in this subsection are taken from our prior opinion. (*In re D.P.*, *supra*.) D.P. is female and was born in June 2007.

---

[1] All subsequent statutory references will be to the Welfare and Institutions Code unless otherwise indicated.

A.    *BACKGROUND*

Father and Mother were both in special education classes when D.P. was an infant.  Mother was 16 years old and living in a group home when D.P. was born.  D.P. was born prematurely, and suffered from sleep apnea.  Mother had been adopted by the maternal great-grandparents following the maternal grandmother's drug-related death.  The maternal great-grandparents ordered Mother to leave their house when she became pregnant, and Mother was on probation for kicking a police officer, hence, Mother's need to reside in a group home.  Staff at the group home found Mother lacked patience with D.P. or became easily frustrated with D.P.  At one point, D.P.'s sleep apnea monitor "began to go off," and Mother threw the monitor against the wall, breaking it.  Mother told group home staff, "'I'm tired of this and I want the baby's father to come and get her because I'm tired of her.'"  D.P. was removed from Mother's care when D.P. was two months old.

Father was 15 years old at the time of D.P.'s removal.  When the San Bernardino County Department of Children and Family Services (Department) investigated the possibility of placing D.P. with Father, it discovered Father was living with the paternal grandmother, who had been charged with child endangerment.  (Pen. Code, § 273a.)  D.P. was placed in the hospital, on a breathing monitor, to be followed by a foster care placement.  On September 4, 2007, the juvenile court found Father to be D.P.'s

biological father. The court ordered the Department to assess P.J., who was supposedly D.P.'s paternal great-aunt, for placement of D.P.[2]

B. *YEARS 2007 THROUGH 2011*

Mother's probation officer informed the Department that the paternal grandmother was pushing Mother and Father to have another child. The probation officer told the Department, "[T]here are strange things going on in the home of the paternal grandmother." For example, the paternal grandmother had approximately 12 people staying in her home, and ex-probationers and an ex-parolee were "in and out of the home on a regular basis."

D.P. was diagnosed as having special needs and was placed in a foster home for medically fragile children. Specifically, in 2008, D.P. was suffering from apnea, gastro esophageal reflux disease, and chronic constipation. D.P. was being evaluated for a suspected seizure disorder and cerebral palsy.

Father completed his parenting classes in November 2007. Father also completed medical fragility training. During visits D.P. would scream and cry until shaking or convulsing when held by Mother or Father. To address the problem, the Department increased Mother's and Father's visitation with D.P. Father worked on being less frustrated and more patient with D.P. Eventually, Father was able to hold D.P. for a few minutes without D.P. crying. Father stated he would try to do well in

---

[2] In 2007, due to Father's and P.J.'s representations, the Department believed P.J. was D.P.'s paternal great-aunt. As will be presented *post*, in 2011, Mother and the Department discovered P.J. may not be Father's relative.

high school and quit smoking for the sake of D.P. The Department found both Mother and Father had shown "a great leap in maturity."

The Department concluded placing D.P. in Father's care would be problematic, since Father was a minor residing in the paternal grandmother's home; specifically, that Father had been listed as a victim in multiple referrals to the Department, two of which were substantiated. Father had been removed from the paternal grandmother's home when he was six years old, due to Father's brother sexually molesting his sister, and the paternal grandmother not responding to the incident. Father stayed in foster care for eight months before reuniting with the paternal grandmother.

D.P. was placed in Mother's care on July 1, 2008; they resided together at Mother's foster home. In October 2008, the Department expressed concern that Father spoke inappropriately to Mother and "call[ed] her names." Father consistently visited D.P. and appeared bonded to D.P.

In October 2008, Father was frequently vomiting, which the Department believed could have been caused by depression. Father was referred to counseling; however, Father did not believe he needed counseling. A social worker told Father that if he did not feel the need for counseling, then the Department would recommend services be terminated for Father. On March 11, 2009, the juvenile court terminated Father's reunification services.

In September 2009, Mother was 18 years old and expressed a desire to move into P.J.'s home. P.J. was a licensed foster parent, and had been supervising Father's weekly

visits with D.P. every other weekend. In October 2009, Mother gave birth to a second daughter, M.G. M.G.'s presumed father was T.G.

In December 2009, the Department received a referral alleging Mother had physically abused D.P. D.P. had bruising on the left side of her face, from the inner ear to the area below the corner of her eye. The Department contacted law enforcement; law enforcement asked D.P. how she received her bruises, and D.P. whispered, "'[M]y mommy did it.'" At the police station, Mother admitted to the social worker that she hit D.P. Mother stated that she "back handed [D.P.] across the face." D.P. fell on the floor, and Mother hit her again. Mother was arrested for physically abusing D.P.

M.G.'s father, T.G., was unable to care for M.G. Father was willing to take custody of D.P., but due to the concerns related to the paternal grandmother, D.P. could not be placed with Father. The Department detained D.P. and M.G. P.J. was unable to take the children, due to already having too many foster children in her care. However, P.J. said she would be willing to take D.P. and M.G. when she was approved to do so. D.P. and M.G. were placed in foster care.

On December 17, 2009, Father offered to move to another residence, away from the paternal grandmother, in order to obtain custody of D.P. and M.G. The social worker did not place D.P. and M.G. with Father due to Father's living situation and services being terminated.

Mother was convicted of child abuse and sentenced to jail for a term of two months—February through March 2010. Father stated that he "'knew nothing'" about the interactions between Mother and D.P. Father requested D.P. be placed with him or

6

P.J. When the social worker asked Father how he would support D.P., Father said, "'I don't have a job, but I will just go on Welfare.'" Father told the social worker he moved in with a friend, because he knew D.P. could not live at the paternal grandmother's house. However, Father later contradicted himself when he reported "there are a lot of people living at the house with [Father] and his mother." Father also reported that he was failing all his high school classes. Father continued visiting D.P. When D.P. saw Father at visits she would run to him and say, "'Da Da!'" During visits, Father changed D.P.'s diapers, gave her breathing treatments, fed her, and played with her. The Department concluded that Father's visits with D.P. were appropriate, but he was unable to provide D.P. with housing or basic necessities, given Father's lack of a job and failing grades.

D.P. and M.G. were placed with P.J. on January 6, 2010. Mother accused Father of soliciting high school classmates to "'jump'" Mother. Father also accused Mother of soliciting high school classmates to "'jump'" Father. In June 2010, the Department reported D.P. and M.G. were doing well in P.J.'s home, and Mother and Father were living together in the paternal grandmother's home. Mother failed to report for her jail sentence, so she was taken into custody on June 2, 2010.

On June 30, 2010, a social worker made a regular monthly visit to P.J.'s home. The home smelled strongly of urine. The social worker became lightheaded and ill while in the house. P.J. said she had three cats, four dogs, and two stray dogs she just found. P.J. said D.P. was still "very much" suffering from asthma, and that she believed M.G. might also have asthma because M.G. had a constant cough. P.J. said she did not

know if M.G. and D.P. were allergic to pets. P.J. said she would like to adopt M.G. and D.P. if reunification did not occur. During an unannounced visit on August 6, 2009,[3] two Department employees found the odor of urine in the house to be "atrocious," which made it difficult for them to complete their visit.

On August 25, 2010, P.J. requested de facto parent status for D.P. and M.G. The juvenile court granted P.J. de facto parent status for both children on September 16, 2010. In November 2011, the Department reported that Mother, Father, and T.G. had been unable to complete their case plans, and due to cognitive delays the three parents might not be able to benefit from services.

On December 22, 2010, Father was convicted of falsely reporting a crime. (Pen. Code, § 148.5.) Father was granted probation for three years. Father attended 12 one-hour therapy sessions. Father continued his supervised visits with D.P. The Department expressed concern that after 42 months Father still did not appear capable of providing D.P. with housing and other necessities.

In April 2011, Mother was six months pregnant with her third child. Mother and Father had decided to conceive another child together because "they did not think that they were going to get [D.P] and [M.G.] back." Although Mother was 20 years old, she continued to be a high school student. Sometime between May 2010 and May 2011, Mother discovered P.J. was not Father's relative by blood or marriage. The Department noted D.P. and M.G. appeared bonded to P.J.

---

[3] Chronologically, this appears to be a typographical error; the visit likely occurred on August 6, 2010.

On May 12, 2011, the Department received a referral related to P.J. It was reported that P.J. struck D.P. on her back and buttocks approximately one dozen times with an open hand, and cussed at the child, while in a preschool parking lot. D.P. screamed and cried while being hit. A Department employee met with D.P., who was three and a half years old. D.P. denied being hit in the preschool parking lot. D.P. said she receives a timeout when she misbehaves. P.J. admitted "swatting" her son, J.M.,[4] but denied striking D.P.

The Department decided to remove D.P. and M.G. from P.J.'s care. On May 20, 2011, the children were taken for emergency forensic medical evaluations. A bruise was found on M.G.'s buttocks. The location of the bruise was such that it would be difficult to have obtained it from falling. Bruises were also found on D.P. On May 24, 2011, the juvenile court ordered D.P. and M.G. be removed from P.J.'s home and placed in foster care.

C.    *FATHER*

On September 16, 2011, Father filed a petition to modify a court order. (§ 388.) In the written petition, Father requested the juvenile court reinstate his reunification services, which had been terminated on March 11, 2009. Father asserted the change would be in D.P.'s best interests because D.P. "has a very close relationship with her father and would enjoy and benefit from more frequent visits for longer periods of time and unsupervised." Father asserted his visits with D.P. were "frequent, constant,

---

[4] P.J. was granted permanent guardianship of J.M. in March 2007.

unmonitored and positive." Father explained the Department would not place D.P. in his care because he had not completed his case plan; however, Father asserted he had completed his case plan. Father asserted he finished the counseling requirement on January 6, 2011, which completed his case plan. Further, Father provided a document reflecting his enrollment in Victor Valley College, with an automotive major.

The Department filed a response to Father's petition. The Department noted Father was "merely" D.P.'s biological father—not D.P.'s presumed father. The Department asserted Father had never resided with D.P. or financially supported the child. The Department agreed Father had completed counseling; however, the Department argued it remained to be seen whether Father had benefitted from the counseling. The Department argued there was no evidence of Father being able to care for himself, and pointed out a lack of evidence that Father completed high school. The Department asserted Father was living with D.P.'s maternal grandfather, and was not financially supporting himself.

Further, the Department asserted Father suffered from issues with self-esteem; healthy relationship skills; appropriate responsibilities; and appropriate boundaries, limits, and family roles. The Department argued Father had not made any significant changes in the problems that led to the dependency. Moreover, the Department argued Father could not be having unmonitored visits with D.P., as Father claimed, unless Father was violating the visitation orders. The Department argued that even if Father received further reunification services, it would be unlikely the Department would agree to a change in Father's visitation with D.P., because he would first need to show that he

10

was changing due to the services. The Department asserted Father had approximately four years to demonstrate a change that would allow D.P. to be returned to his care; since Father had not done so, the Department argued it was unlikely Father could make the necessary changes within the six to 18 months provided for further services.

The juvenile court held a hearing on Father's petition on October 11, 2011. At the hearing Father asserted he had unsupervised visits with D.P. while the case was in Riverside County's jurisdiction; he stopped having unsupervised visits when the case was transferred to San Bernardino County's jurisdiction. Further, Father asserted he had a job, and he brought a leave and earnings statement from the San Bernardino County Superintendent of Schools as proof of his employment. Father's employment began on August 20, 2011. Father argued he did not pose a danger to D.P. as all his visits were appropriate; D.P.'s sibling, K.P., was in Father's care and not in danger.

The Department feared that if the case persisted for much longer, D.P. would no longer be at a desirable age for adoption, which would be detrimental to D.P. The Department further argued that Father was living with Mother and K.P. in the maternal grandfather's home, and Mother appeared unable to benefit from services. The Department concluded Father did not have a change in circumstances that would support a reinstatement of his reunification services.

The Department added that D.P. and M.G. have been together for most of M.G.'s life. The Department said the children continued to be placed together after they were removed from P.J.'s home. The Department argued D.P.'s case had been persisting for four years and three months, and it was in D.P.'s best interests to place her for adoption.

11

Counsel for D.P. argued Father was only a biological Father, not a presumed Father. D.P.'s counsel asserted Father could not rise to the level of a presumed father since he never resided with D.P. D.P.'s counsel argued Father legally had no right to custody of D.P., and therefore, Father should have filed a section 388 petition requesting presumed father status before he filed the petition for additional services. D.P.'s counsel expressed concern that the case would continue for another four years if the petition were granted. D.P.'s counsel asked the court to deny Father's petition. Attorneys at the hearing argued about whether Father may have been designated a presumed Father sometime in 2007, but the relevant court records from Riverside were not immediately available.

The juvenile court said: "What I'm concerned about is this case had been going on since, approximately 2007 [a]nd I don't really see a change in circumstances." The juvenile court continued: "I mean, essentially he's been at supervised visits for the last two years of this. I mean the last two year period, basically, since the case was transferred to San Bernardino. And there's been no change of that visitation schedule. So again, I guess I don't see what circumstances have changed." The juvenile court added that gaining employment "in and of itself is not grounds for the court to find a change in circumstance." In regard to D.P.'s best interests, the court remarked that D.P. had never lived with Father, and D.P. had a strong bond with M.G., but not with K.P.

The juvenile court found Father had made "wonderful strides," but he was not in a position to care for D.P., and the court was unsure how six months of services would cure the problem. The court said, "I don't see any change. You knew when you were

12

here back in March of 2011 that the court wanted to see you make substantial strides to be able to care for this minor. And, I just haven't seen anything additional from you since that date. And I don't see that it is in [D.P.'s] best interest today to offer you services. And with that, the court will deny the [section] 388 request."

II.     CURRENT RECORD

We now present the events that have taken place since we last addressed this case.

A.     *MOTHER'S REQUEST TO CHANGE A COURT ORDER*

In November 2011, D.P. and M.G. were placed together in the home of prospective adoptive parents. The prospective adoptive home was D.P.'s sixth placement. D.P. was meeting her developmental milestones, but was behind in skills, such as knowing the alphabet and writing. D.P. was four years old in April 2012, but was not yet attending school. M.G. was two years old in April 2012. M.G. appeared to have "a good attention span for learning." The children were developing "strong and healthy" bonds with their prospective adoptive parents and brothers. D.P. was "thriving on the attention and assistance" she was receiving with her educational needs. The children appeared "comfortable and happy" in the prospective adoptive family's home. The children were "smiling more than ever." A Department social worker concluded the children were too young to give statements about their feelings on being adopted. The social worker described the children as "unable to verbalize themselves."

Mother and Father (Parents) visited the children every week for two hours of supervised visitation. It appeared Parents loved their children, but the visits were

13

"frequently chaotic." The children did not "listen to or respond to the [P]arents' requests in regard[] to discipline." Parents often focused on K.P. during the visits; K.P. was not a dependent of the court. The children "frequently hit each other, and [D.P.] told her mother she did not want to visit her anymore." The children had difficulty sleeping through the night following visits with their parents. Mother blamed the prospective adoptive mother for the children's negative behaviors and requested the children be moved to a new foster home.

K.P., who is D.P.'s full brother and M.G.'s half brother, was 10 months old in April 2012. D.P. and M.G. enjoyed seeing K.P. at visits, but did not "interact much" with him during the visits. Parents seemed "bored" during the visits—they would "sit and stare at the children," rather than interacting with them. When a weekly visit was canceled due to the children being ill, a Department social worker tried to reschedule the visit for a day that happened to be Mother's birthday. Mother told the social worker she "did not really want to spend [her birthday] at the CPS office." The Department recommended the visits be reduced to one hour per month because: (1) the visits appeared to be too long for the children, who had to travel 30 miles to the visits; and (2) the Department believed the children's permanent plan should be adoption.

Mother filed a request to change a court order. Mother requested the children be placed in her custody and that the court vacate the termination hearing. Mother asserted the following as changed circumstances: (1) Mother was seven weeks away from completing her 52-week anger management course, (2) Parents had completed all their coursework for their high school diplomas, (3) Parents were employed, (4) Father had a

14

driver's license and a car, (5) Father's sister could provide childcare when Parents were unavailable, (6) Mother completed her counseling requirement, and (7) the voluntary family maintenance plan for K.P. was dismissed.

The Department requested the juvenile court deny Mother's request to change a court order because both parents had already been given extra time to complete their case plans, but had not shown any significant benefit from the reunification services or shown a significant bond with the children. The Department asserted the children "deserve to have a stable plan," which was adoption. The juvenile court denied Mother's request to change a court order, concluding the request was not in the children's best interests.

### B.     *TERMINATION*

The children continued residing with their prospective adoptive family. The children were strongly bonded to their prospective adoptive parents, and were also bonded to their prospective adoptive brothers, cousins, and grandparents. The children referred to their prospective adoptive parents as "'mom'" and "'dad.'" The children required encouragement to attend visits with Parents. However, the visits with Parents "improved since the length of the visits [was] decreased."

Parents requested a contested termination hearing on the issue of whether the parental bond exception should be applied. On October 30, 2012, the juvenile court held the contested termination hearing concerning the application of the parent-child bond exception. Department Social Worker Charrey testified at the hearing. The social worker supervised three of Parents' complete visits and partially supervised two other

visits. D.P. usually appeared happy when greeting Parents. At the end of the visits, D.P. told Parents "goodbye" and left. D.P. did not appear happy, sad, or otherwise display emotion when the visits ended. The social worker believed Parents were more akin to friendly visitors than parents.

Father testified at the hearing. D.P. refers to Father as "'Dad.'" Parents visited the children once per week. Father testified that D.P., "don't have manners" and "don't listen to no adult." For example, the children ignore Father when he tells them to stop fighting. Father believed his visits with D.P. went well, because D.P. was often sad when visits started, but was happy when they ended. Father observed in the past that D.P. cried when visits ended, but within two months of the hearing she had stopped crying at the end of visits. Father testified that D.P. never lived with him.

Mother also testified at the hearing. D.P. and M.G. refer to Mother as "'Mommy.'" D.P. asked Mother multiple times why D.P. was not allowed to go home with Mother if K.P. was allowed to live with Mother. The last time D.P. asked about going home with Mother was months before the hearing. At the visits, Mother practiced handwriting with D.P.; M.G. often sat in Mother's lap for 20 or 30 minutes.

Mother believed it would not be in D.P.'s best interests to terminate parental rights because D.P. often talked about future visits with Mother, so Mother believed D.P.'s mindset was that she would continue visiting Parents. Mother testified that D.P. and M.G. lived more of their lives in the Department's custody than in Mother's custody. The social worker testified that she never saw D.P. cry at the end of a visit and never heard D.P. say that she wanted to live with Mother and/or Father.

16

The juvenile court attorneys for Parents argued that termination of parental rights was not necessary in this case because Parents were successfully raising K.P. and completed their reunification services. The attorneys argued something "less dramatic" than termination should occur. The children's attorney argued that it was not in the children's best interests to apply the parent-child bond exception because the children "need stability." The Department's attorney argued that he had never seen a case as long as D.P.'s case, in that D.P. had been removed in 2007. The Department's attorney argued that the children "deserve permanency."

The juvenile court found the children were likely to be adopted due to (1) the length of time the children lived with the prospective adoptive family, and (2) the improvements in the children's behavior and attitudes since living with the prospective adoptive family. The court found Parents regularly visited the children, but that the benefits of maintaining the parent-child relationships did not outweigh the benefits the children would receive from being adopted. The court found Parents "decided that getting [their] children back was not [their] goal, and [Parents] became visitors with [the] children instead of parents." The court explained that the children were not engaged while visiting Parents, but were "engaged in their new potential adoptive home." Thus, the juvenile court concluded the parent-child bond exception was not applicable in this case.

The juvenile court terminated (1) Mother's parental rights to D.P. and M.G., (2) Father's parental rights to D.P., and (3) T.G.'s parental rights to M.G. The juvenile court ordered adoption be the children's permanent plan.

17

## DISCUSSION

A.      PARENT-CHILD BOND EXCEPTION

Parents contend the juvenile court erred by terminating their parental rights, because the court should have applied the parent-child bond exception. (§ 366.26, subd. (c)(1)(B)(i).) We disagree.

If a juvenile court finds a dependent child is adoptable, then it will terminate parental rights unless one of the statutorily enumerated exceptions is applicable. (§ 366.26, subd. (c)(1).) One of the enumerated exceptions provides that parental rights shall not be terminated if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) We review the juvenile court's decision to not apply the parent-child bond exception for an abuse of discretion.[5] (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449.)

The first requirement for the parent-child bond exception is that Parents maintained regular visitation with the child, thus, we address that issue first. The juvenile court found Parents maintained regular visitation with the children. The court's

---

[5] There appears to be a split of authority as to which standard of review is applicable to a decision to not apply the parent-child bond exception. (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424-425 [Fourth Dist., Div. Three applied the substantial evidence standard]; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 [Fourth Dist., Div. One applied the substantial evidence standard].) We choose to follow the precedent of *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351, which explained the abuse of discretion standard is applicable because "[t]he juvenile court is determining which kind of custody is appropriate for the child[, and s]uch a decision is typically review[ed] for abuse of discretion."

finding is supported by the evidence, in that it appears the visits were generally canceled only when the children were ill or unable to be transported in a timely manner to the visits.  Accordingly, the court did not abuse its discretion as to this factor.

We now turn to the "benefit" prong of the analysis.  "The benefit to the child from continuing such a relationship must . . . be such that the relationship '"promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."'  [Citation.]"  (*In re Aaliyah R.*, *supra*, 136 Cal.App.4th at p. 449.)  In other words, for the exception to apply the bond between the parent and child must be a parent-child bond, rather than the type of bond a child might have with a friendly visitor or non-parent relative, such as an aunt.  (*In re Angel B.* (2002) 97 Cal.App.4th 454, 468.)

In regard to Father, Father testified that D.P. was often sad when visits started, but was happy when they ended.  Father interpreted this as the visits going well; however, the juvenile court could reasonably interpret it the other way—that D.P. was sad to have to visit Parents, and happy when she was allowed to leave the visits.

Father observed in the past that D.P. cried when visits ended; within two months of the hearing she had stopped crying at the end of visits.  This evidence could also reasonably be interpreted as D.P. distancing herself from Parents, in that she was not sad to leave them; D.P. no longer viewed Parents as her parents.  Father testified that the children ignored Father when he told them to stop fighting.  This testimony is further evidence that the children did not view Father as a parental figure, because the children were ignoring Father during visits—not talking back to him, but ignoring him as though

19

he were not there—this reflects a lack of interaction and parent-child bond. Thus, the juvenile court could reasonably conclude Father was not fulfilling a parental role.[6]

In regard to Mother, the last time D.P. asked about going home with Mother was months before the hearing. It appears that at some point in the months prior to the hearing, D.P. severed any parent-child bond that may have existed between her and Parents, in that she stopped crying at the end of the visits and stopped asking about living with Mother. At one point, D.P. told Mother "she did not want to visit her anymore." Further, the children had difficulty sleeping through the night following visits with Parents, which could reasonably be interpreted as reflecting discomfort with the visits, rather than a positive parent-child interaction.

The social worker believed Parents were more akin to friendly visitors than parents. The social worker described the visits as "frequently chaotic," and explained the children did not "listen to or respond to the [P]arents' requests in regard[] to discipline." This evidence reflects Parents were not fulfilling a parental role in the children's lives, in that the children ignored Parents during their brief weekly interactions. It appears Parents were friends to the children, but not parents.

---

[6] The Department requests this court strike Father's Appellant's Opening Brief or order that it be redrafted, because Father has only provided one paragraph reflecting that he joins in Mother's arguments. Since Father has not provided any meaningful analysis, the Department asserts his brief should not be considered. While we appreciate the Department's procedural argument, we chose to address this issue as though Father raised a substantive argument, for the sake of thoroughness and also because the issue is easily resolved.

Further, the evidence reflected the children were thriving in the home of their prospective adoptive parents. D.P. had been through six different foster homes during her life. D.P. was "thriving on the attention and assistance" she was receiving with her educational needs. The children appeared "comfortable and happy" in the prospective adoptive family's home; they were "smiling more than ever." Given this evidence, it appears the prospective adoptive home was promoting the children's wellbeing much better than Parents were. The visits with Parents were chaotic and the children ignored them, while the home of the prospective adoptive parents caused the children to smile and develop their educational skills. Given the foregoing evidence, the juvenile court could reasonably conclude that the benefits to the children from continuing their relationships with Mother and Father were outweighed by the wellbeing the children would gain from being in a permanent home with an adoptive family.

Mother asserts the evidence of the children ignoring Parents during visits "does not logically lead to the conclusion that there is 'no significant bond' between them," because children often ignore parents. We agree evidence of the children ignoring Parents, alone, likely would not a support a finding of a lack of an emotional bond, because the children could just be being difficult. However, the lack of an emotional bond is further supported by evidence of (1) D.P. asking to stop visiting Mother, (2) D.P. not having an emotional reaction to visits ending, (3) D.P. being sad when visits began, and (4) Parents appearing "bored" during the visits as evinced by them "sitting and staring" at the children, rather than interacting with them. It is all this evidence, combined with the children ignoring Parents, that makes it reasonable for the juvenile

21

court to conclude there was a lack of a parent-child bond, because it appears the visits regularly involved ignoring, staring, chaos, and a lack of emotion.

Next, Mother argues that evidence of the children being happy in their prospective adoptive home is "entirely irrelevant to the question of degree of parent-child relationship." (Italics omitted.) We do not find Mother's argument to be persuasive because the second prong of the analysis is concerned with the issue of whether the benefit from continuing the parent-child relationship outweighs the well-being the child would gain from being in a permanent adoptive home. (*In re Aaliyah R.*, *supra*, 136 Cal.App.4th at p. 449.) In order to perform this analysis, a court must consider how the child is feeling in the prospective adoptive home. Thus, the juvenile court was considering relevant evidence when discussing the children's lives in their prospective adoptive home.

## B. D.P.'S FEELINGS

Mother contends the juvenile court erred by issuing its ruling without evidence of how D.P. felt about Mother. We disagree.[7]

Mother's contention raises a pure question of law, or legal error, which concerns undisputed facts. Accordingly, we apply the de novo standard of review. (*In re R.C.* (2011) 196 Cal.App.4th 741, 748.)

---

[7] The Department asserts Mother forfeited this argument by failing to raise it in the juvenile court. We choose to address the merits of Mother's argument, since it involves a mandatory duty imposed upon the juvenile court. (See *In re Guardianship of Christian G.* (2011) 195 Cal.App.4th 581, 596 ["[T]he duty we discuss is imposed directly on the government by statute and should not require any prompting by the parent to trigger its application"].)

Section 366.26, subdivision (h)(1) provides:  "At all proceedings under this section, the court shall consider the wishes of the child and shall act in the best interests of the child."  "This evidence may be presented by direct formal testimony in court, informal direct communication with the court in chambers, reports prepared for the hearing, letters, telephone calls to the court, or electronic recordings.  [Citation.]"  (*In re Joshua G.* (2005) 129 Cal.App.4th 189, 201.)  The evidence does not need to reflect precisely how the child feels about the prospect of parental rights being terminated, rather, the evidence should provide the juvenile court with information about the child's feelings regarding her biological parents, prospective adoptive parents, and living arrangements, so the court can infer the minor's wishes regarding termination of parental rights.  (*In re Amanda D.* (1997) 55 Cal.App.4th 813, 820.)

A Department report reflects D.P. was five years old at the time of the termination hearing.  A social worker described the children as "unable to verbalize themselves."  The social worker concluded the children could not give statements about being adopted due to their "young ages."  D.P. was described as being able to run, jump, and play at an age appropriate level, but she was behind in skills such as knowing the alphabet and writing.  Thus, the social worker explained why it was difficult to gather direct information from the children about their feelings regarding Parents and adoption—the children's communication skills were lacking.

Nevertheless, two Department reports reflect D.P. told Mother she did not want to visit Mother.  The Department reported the children were "smiling more than ever" in their prospective adoptive home.  From this evidence, the juvenile court could gain a

23

sense of how D.P. felt about Mother and how D.P. felt about the prospective adoptive family. D.P. directly stated to Mother on two occasions she no longer wanted to visit her. This is strong evidence D.P. did not feel a particularly strong bond with Mother. Accordingly, we conclude the juvenile court did not err because the record includes evidence concerning D.P.'s wishes, as required by section 366.26, subdivision (h)(1).

Mother asserts the record does not include the required evidence concerning D.P.'s wishes, because D.P. should have been asked how she felt about (1) Mother, and (2) visiting Mother. As explained *ante*, the record did include this evidence, e.g., D.P. said on two occasions that she did not want to visit Mother. To the extent Mother wanted different evidence in the record concerning D.P.'s feelings, Mother had the opportunity to present that evidence at the juvenile court hearing. (*In re Johnny M.* (1991) 229 Cal.App.3d 181, 190 [due process requires taking proper evidence from a parent at a contested hearing].) We will not fault the juvenile court for Mother's decision to not present the evidence she desired.

Father does not present an independent argument concerning this evidence contention; he merely joins in Mother's argument. Thus, we conclude the juvenile court also did not err in regard to Father, since the argument and analysis are the same.

C. ICWA

1. *PROCEDURAL HISTORY*

M.G. was detained in December 2009. Mother denied having Native American ancestry, but M.G.'s father, T.G., said he might have Native American ancestry, although he was unsure of the tribe. In court, T.G. reported "he was part Cherokee and

24

Sioux" and "that the Indian heritage is on his father's side of the family." T.G. told the court he learned about the alleged tribal affiliations from his father.

The Department sent notices to (1) the Bureau of Indian Affairs, (2) three Cherokee tribes, and (3) 16 Sioux tribes. The notices included (1) M.G.'s full name, date of birth, and place of birth; (2) Mother's full name, alias, birthday, and place of birth; (3) T.G.'s full name, address, birthday, and potential tribal affiliations; (4) maternal grandmother's full name and year of death; (5) T.G.'s mother's full name, address, and birthday; (6) T.G.'s father's full name, birthday, and possible tribal affiliations; (7) maternal great-grandmother's full name, maiden name, address, and birthday; (8) a second maternal great-grandmother's full name, year of death, and place of death; and (9) maternal great-grandfather's full name, address, birthday, and country of birth. The Bureau of Indian affairs, two Cherokee tribes, and 15 Sioux tribes responded to the Department indicating that M.G. was not a tribal member and was not eligible to enroll in the tribes. On April 22, 2010, the juvenile court found ICWA did not apply to M.G.

2. *ANALYSIS*

Mother contends the juvenile court erred by terminating her parental rights to M.G. because the Department did not ask M.G.'s paternal grandparents about their possible Native American ancestry. Mother asserts there was "missing information" that T.G.'s family could have possibly provided if asked.

The Department asserts Mother forfeited this issue for appeal by failing to file a timely appeal. The Department stresses the fact that the juvenile court's ICWA finding

25

was made three years ago. While we agree the timeliness of this contention is a valid issue, we choose to address the merits of Mother's assertion, because it is easily resolved. (See *In re Jonathon S.* (2005) 129 Cal.App.4th 334, 339-342 [Fourth Dist., Div. Two] [discussing the timeliness of ICWA notice appeals].)

We apply the substantial evidence standard of review when analyzing the juvenile court's factual findings. We look at the evidence in the light most favorable to the court's finding. (*In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1430; *In re Christian P.* (2012) 208 Cal.App.4th 437, 451.) The juvenile court and child welfare agency have "an affirmative and continuing duty to inquire whether a child is or may be an Indian child." (Cal. Rules of Court, rule 5.481(a).) If a social worker "knows or has reason to know that an Indian child is or may be involved, that person . . . must make further inquiry as soon as practicable by: [¶] (A) Interviewing the parents, Indian custodian, and 'extended family members' . . . to gather the information listed in Welfare and Institutions Code section 224.2(a)(5), Family Code section 180(b)(5), or Probate Code section 1460.2(b)(5), which is required to complete the Notice of Child Custody Proceeding for Indian Child (form ICWA-030)." (Cal. Rules of Court, rule 5.481(a)(4)(A).) The phrase "'extended family member[s]'" includes the "child's grandparent, aunt or uncle, brother or sister . . . ." (25 U.S.C.A. § 1903(2).)

The Department's notices include identifying information for T.G. and T.G.'s father. The Bureau of Indian Affairs concluded the Department "provided an appropriate notice to the tribe or tribes." Accordingly, the record reflects the notices sent by the Department were sufficient for the tribes to determine whether M.G. had

26

Native American ancestry.  Accordingly, the juvenile court's finding the Department complied with the ICWA notice provisions is supported by substantial evidence.

Mother asserts more information should have been provided about T.G.'s father and grandparents.  However, Mother does not explain what this information would have reflected or how it might have resulted in a different outcome.  Thus, even if there were error in the ICWA notice findings it is unclear how the alleged error may have resulted in a miscarriage of justice.  (*In re Christian P.*, *supra*, 208 Cal.App.4th at p. 452 ["'An appellant seeking reversal for lack of proper ICWA notice must show a reasonable probability that he or she would have obtained a more favorable result in the absence of the error'"].)  Accordingly, we find Mother's argument to be unpersuasive.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER

J.

We concur:


RAMIREZ

P. J.


CODRINGTON

J.

27