Filed 7/30/15  Adoption of A.P. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| Adoption of  A. P., a Minor. | C076310 |
| NANCY S., | (Super. Ct. No. CVSA1231) |
| Plaintiff and Respondent, | |
| v. | |
| STEPHANIE G., | |
| Defendant and Appellant. | |

Stephanie G., mother of the minor, appeals from orders terminating her parental rights and denying her petition to dismiss the termination action.  (Prob. Code, § 1516.5, see also Fam. Code, § 7800, et seq.)  Mother argues that the court could not entertain a petition to terminate her parental rights pursuant to Probate Code section 1516.5 because she was denied due process in the establishment of the underlying guardianship in that the probate court did not make any referral to the relevant child welfare agency as

1

required by former Probate Code section 1513, subdivision (c) (hereinafter section 1513(c)) at the time the guardianship was granted.[1]  Mother further asserts that the order terminating parental rights must be reversed because the record does not reflect compliance with the duty of inquiry as required by the Indian Child Welfare Act (ICWA), California statutes and the California Rules of Court.  (25 U.S.C. § 1901 et seq.; Welf. & Inst. Code, § 224.3; Cal. Rules of Court, rule 5.481.)  Agreeing only with the latter contention, we reverse for compliance with ICWA.

FACTS

A

*The Guardianship*

In March 2009 the minor's paternal grandmother, Nancy S., filed a petition for guardianship of the 14-month-old minor, alleging that the minor was left in her care for ten days without any contact from mother.  The petition further alleged mother used methamphetamine and was frequently in custody.  An attachment to the petition stated the minor was not eligible for membership in an Indian tribe.  The minor's father consented to the guardianship.  The court appointed the paternal grandmother temporary guardian for the minor in April 2009 and referred the case to the court investigator.

The court investigator's report reiterated the allegations of the petition that mother used methamphetamine, was frequently in jail, was homeless and was neglectful of the minor.  The report said the minor was currently living with the paternal grandmother who reported a "marginal amount" of Cherokee heritage but did not claim the minor was, or might be, an Indian child.  The report stated mother opposed the guardianship.  The

---

[1]     The statute has since been amended.  The provision, modified to change the relevant language from mandatory to permissive, now appears in subdivision (b) of Probate Code, section 1513.

investigator concluded that guardianship was necessary and recommended the court grant the petition.

Both mother and the paternal grandmother testified at the guardianship hearing on May 13, 2009. The court granted the guardianship petition, finding by clear and convincing evidence that placing the minor with mother would be detrimental and that placement with the paternal grandmother was in the minor's best interest. The court did not make a 1513(c) referral at that time. Letters of guardianship issued.

On May 20, 2009, the court reviewed the matter, finding mother was in a 90-day drug treatment program. In September 2009, the court again reviewed mother's status, finding she had graduated from inpatient treatment and was in an outpatient program. The court adopted a visitation schedule and set a further review. Mother did not appear at the December 2009 review and there was no proof before the court of any ongoing treatment.

In February 2010, mother sought a modification of the visitation orders alleging she had relapsed but had been clean for three weeks. By the end of March 2010, mother was back in treatment after another relapse. In April 2010, mother said she did not want to end the guardianship, she only wanted increased visitation.

In March 2010, the guardian filed a request to modify the visitation order, seeking suspension of visits due to a violent altercation during a visit.[2] The guardian opposed mother's request to increase visits and asserted she was no longer willing to supervise visitation.

---

[2] The guardian sought and was granted a restraining order against mother and her sister based on the incident.

At the hearing on the two visitation requests in April 2010, the court ordered mother to provide a written report from her treatment program, document her living arrangements, attend a 12-step program and provide proof of two months of employment. The court ordered supervised visits at the family resource center (center) twice a month, to be canceled if mother was more than 15 minutes late.

The guardianship annual report stated mother's visits at the center were terminated due to missed visits. At the guardianship review in August 2011, the court noted mother was in custody.

In January 2012, mother again sought modification of the visitation order, alleging that, since her release she had been in a drug treatment program with inpatient and outpatient treatment, she had been sober for six months and would graduate from the program in March 2012. The guardian opposed the request, alleging mother had not seen the minor for over a year and visited only sporadically before that. At the hearing on mother's request for modification, the court observed the guardian had filed a petition to terminate parental rights and a petition for adoption and served mother in open court. The minute order does not reflect that either party was asked about their Indian heritage.

B

*The Termination Proceeding*

In April 2012, the guardian filed an adoption request and a petition to terminate mother's parental rights pursuant to Probate Code section 1516.5. The petition alleged the minor had been in guardianship more than two years with only sporadic contact with either parent due to parental drug use and incarcerations. The petition further alleged mother had not visited the minor for over a year and had intermittent supervised visitation prior to that. The petition alleged the minor had no significant bond to mother and the father had agreed to relinquish his parental rights.

4

The court appointed counsel for mother. In August 2012, the court allowed mother two visits to be supervised by a therapist. In September, the court authorized one additional visit.

A probation report pursuant to Family Code section 7851, filed in October 2012, listed part of mother's criminal history, including convictions which resulted in several jail terms and drug treatment referrals. The probation officer interviewed the guardian who explained she had instituted guardianship proceedings in 2009 due to mother's significant drug issues, her care of the minor, and her living conditions. The guardian told the probation officer she wanted to provide a stable loving home for the minor and believed adoption was in the best interests of the minor. The probation officer also interviewed mother who said she had been in jail in 2011, was terminated from Proposition 36 probation and became involved in the "Treatment Accountability for Safer Communities" (the program) which sent her to residential treatment. Mother's support person in the program said mother was compliant with the program and completed it. Mother was living with her sister, working, trying to get visitation with the minor and wanted to regain custody of the minor. The probation officer observed the minor in the guardian's home. The minor spoke about the guardian, his cousins and other interests but did not mention mother, although he had visited her within the week. The report stated that the evidence did not conclusively support termination of parental rights at present and recommended the petition be put over for six months to obtain further proof.

In October 2012, mother filed a motion to dismiss the petition for adoption alleging that the probate court had not complied with the mandatory duty to refer the case to the child welfare agency as required by the former version of section 1513(c). Mother contended that proceeding to adoption in light of the prior statutory violation constituted a denial of due process. Mother filed a second motion to dismiss the petition for adoption based on Probate Code section 1516.5, arguing it was unconstitutional as applied to her

because there had been no showing of parental unfitness and termination of her parental rights would violate due process.

At the hearing on the motions, a child welfare supervisor from the Yolo County Department of Social Services (the department) testified there was no documentation of a referral on this minor in 2009, however there was a referral in May 2009 for the minor as a child of a mother who had a referral for delivering a baby born positive for drugs. No further investigation was done on the minor because he was safe in the care of the paternal grandmother and the mother refused services as to the newborn. The court continued the hearing and ordered a referral to the department pursuant to former section 1513(c).

At the hearing on the motions to dismiss on January 28, 2013, a representative of the department appeared with county counsel and informed the court that the department had no concerns with the minor being in the guardian's custody. The department would intervene and file a petition only if the guardianship were to be dissolved. Mother then took the position that the guardianship should be dissolved as it was the only way to remedy the previous failure to refer the case to the child welfare agency. The court responded that all the statute required was a referral and declined to dissolve the guardianship at this late date because doing so was not in the minor's best interests. The court denied the motion to dismiss the petition to terminate parental rights based on failure to comply with section 1513(c), finding that the flaw in failing to refer the case had been corrected. The court also denied the second motion based on Probate Code section 1516.5 without prejudice to reopen the issues.

Trial on the request to terminate parental rights commenced January 10, 2014. Mother renewed her motions to dismiss the proceeding based on the previous failure to refer the case to the child welfare agency as required by section 1513(c) and on the argument that section 1516.5 was unconstitutional as applied. The court again denied both motions.

The guardian testified that guardianship orders issued in May 2009 and were preceded by a temporary guardianship. The guardian testified about visitation that occurred during the guardianship. Of the 18 visits the guardian arranged and supervised, mother did not attend 12 and was late for the remaining six. Mother then had supervised visits at the center but did not have contact with the minor after February 2011. The guardian said she began adoption proceedings a year later. The court subsequently ordered a total of three visits supervised by a therapist. Mother was late to the second visit and did not attend the third visit. There was no further contact between mother and the minor after October 19, 2012. The guardian testified about the minor's current circumstances. The guardian stated that she became concerned about the minor due to the parents' lack of stability and changed her focus from guardianship to adoption. She believed adoption was in the minor's best interest because it would provide stability for him.

Linda Herrera, the director of supervised visitations at the center, testified the visits began July 11, 2010. Visits that did occur went well with no problems but were ultimately terminated in April 2011 due to excessive absences. Mother visited twice in July and once in September and November of 2010 and once in January and February of 2011. Mother did come in May 2011 and was told that she was disenrolled due to absences.

The therapist who supervised the visits in the fall of 2012 testified that all the parties arrived in a timely fashion for the first visit. At first, the minor was anxious but seemed glad to see mother as the visit progressed. Both mother and the minor became agitated and anxious, and the therapist intervened to restore calm and the interaction normalized. At the second visit, mother was late. The minor was calmer but had a cold and was more withdrawn but, after engaging in play therapy, he was more relaxed and willing to play with mother. Mother did not come to the third visit and there was no communication from her. The therapist spent the hour with the minor who was

7

disappointed and upset. The therapist said the minor did remember mother although he sometimes referred to her as "aunt." The therapist felt that the therapeutic work in the first two visits helped mother and the minor reconnect and the minor looked forward to seeing mother again.

Mother testified she did oppose the guardianship when it was initiated but was now asking to terminate it because it was not in the minor's best interest. Mother agreed she lied to the probation officer who investigated the adoption case, telling him she only had one child, while in fact she had a daughter in May 2009, born addicted to methamphetamine, that she gave up for adoption. Mother recognized that the minor needed a stable home and, while she currently could not give him that, she did not want him adopted. Mother said it was important for a mother and child to be together and she would be able to provide for him in eight months because she was sober and working. Mother said she did not attend the third therapeutic visit because she had relapsed and had not seen the minor in the 18 months since. Mother estimated that she had approximately 20 visits of one to two hours with the minor since he was 14 months old. Mother acknowledged she had been in three court-ordered treatments and was currently in a fourth but believed she was now strong in her recovery. She had been sober for a year from October 2012 to October 2013 before the arrest which led to the current drug court referral. Mother testified she completed the inpatient portions of the first three programs but not the aftercare and was now in an intensive outpatient program.

Dr. Ross Thompson, a distinguished professor of psychology and an expert in child development and attachment, testified that a child's relationship with the caregiver is foundational to the child's sense of security. Because a young child does not have a developed sense of past or future, regular contact with the primary caregiver is essential to maintaining a feeling of being able to count on a caregiver. Infrequent visits over time from a biological parent would not maintain the sense of that person as a primary caregiver, but visits could be a wonderful play experience. Dr. Ross testified that, if a

8

child has a history of being let down by relationships, then the child comes to expect that and will be guarded and cautious in new situations, affecting the child's ability to develop healthy relationships over time.

## C

### *The Statement Of Decision*

The court issued its statement of decision in March 2014.

The court indicated the termination of parental rights in the case was governed by Family Code section 7802 and the elements of Probate Code section 1516.5, which had to be found by clear and convincing evidence.

The court found that mother did not have legal or physical custody of the minor and had not had such custody since the temporary guardianship was granted in April 2009. Further, from the time the minor was about 15 months old to the present, the minor has been in the guardian's care. Both mother and father were intermittent presences in the minor's life. Mother persistently expressed interest in being a parent to the minor but "failed to show up for that role for the last four" years of the minor's life. The minor had a relationship with both mother and the guardian who was the primary caregiver for the minor. Mother had a strong attachment to the minor but there was no evidence the minor had the same level of attachment to mother. Further, the attachment did not rise to the level of caregiver despite the minor's affection for, and recognition of, mother in the 20-40 hours of visits over the last five years. The minor needed stability. Mother's missed visits were stressful for the minor, although buffered to some degree by the guardian's presence as primary caregiver. Mother had no track record of successful rehabilitation from drug use outside a residential program and her current prospects for success were slim. Mother conceded she currently cannot parent the minor, but opposed adoption. Her position reflected her desires but not the minor's best interests. It was undisputed that the minor was thriving in the guardian's care and would benefit from being adopted by the guardian. The court found there was clear and convincing evidence it was in the

minor's best interest to terminate mother's parental rights. The court ordered mother's parental rights terminated, continued the guardianship, and set a date to review the adoption petition.

DISCUSSION

I

*Order Terminating Parental Rights*

Mother argues reversal of the order terminating parental rights is required because she was denied due process in the underlying guardianship when the probate court failed to comply with a mandatory statutory duty to refer the case for an investigation by a social worker to determine whether child welfare services should be provided. Mother contends that had she had an opportunity to reunify in a dependency proceeding she would have been provided due process and counsel and the belated referral during the pendency of the petition to terminate parental rights did not cure the error.

When a guardianship petition is filed in the probate court, the provisions of Probate Code section 1513, which govern investigation of the circumstances surrounding the petition, apply. (Prob. Code, § 1513.) One circumstance is the possibility that a dependency proceeding might be more appropriate than a probate guardianship. (Prob. Code, § 1513, subd. (b) [formerly § 1513, subd. (c)].)

In 2009, when the petition in this case was filed, former section 1513(c) provided: "If the investigation finds that any party to the proposed guardianship alleges the minor's parent is unfit, as defined by Section 300 of the Welfare and Institutions Code, the case shall be referred to the county agency designated to investigate potential dependencies. Guardianship proceedings shall not be completed until the investigation required by Sections 328 and 329 of the Welfare and Institutions Code is completed and a report is provided to the court in which the guardianship proceeding is pending." The statute requires only that the case be referred, not that the child welfare agency file a dependency petition or provide services in lieu of filing a petition.

10

Two years after the guardianship was granted, section 1513(c) was interpreted in *Guardianship of Christian G.* (2011) 195 Cal.App.4th 581 (*Christian G.*), an appeal from the appointment of a guardian. (*Christian G.*, at p. 588.) In that case, the at-risk minor remained in the father's custody until relatives were appointed as temporary guardians. (*Christian G.*, at pp. 588-589.) There was a probate court investigation but the case was not referred to Child Protective Services despite the father's insistence that only it could take his child.[3] (*Christian G.*, at p. 595.) The father objected to the guardianship and litigated the matter in contested hearing. (*Christian G.*, at pp. 590, 593-594.)

The *Christian G.* court observed that section 1513(c) was phrased in mandatory terms and the legislative history supported the conclusion that the referral was mandatory, but acknowledged that the provision was "honored 'more in the breach than the observance' " and that, while claims of parental unfitness were common in probate guardianships, referrals were rarely made. (*Christian G.*, *supra*, 195 Cal.App.4th at pp. 603-604.) This case is an example of that practice.

*Christian G.* held "that the probate court, having received information constituting an allegation of unfitness, whether from the investigator's report or from the pleadings themselves, is directly obligated to order the case referred" to the appropriate child welfare agency. (*Christian G.*, *supra*, 195 Cal.App.4th at p. 604.) The court reversed the guardianship appointment finding that, under the facts of that case, failure to make the mandatory referral to the child welfare agency was prejudicial to the father. (*Christian G.*, at pp. 607-611.)

The case before us is factually and procedurally distinguishable from *Christian G.* Here, the orders appointing the guardian were final in 2009 as no appeal was taken.

---

[3] Child Protective Services was involved in the case only insofar as it recommended that the relatives pursue a probate guardianship. (*Christian G.*, *supra*, 195 Cal.App.4th at p. 589.)

(Prob. Code, § 1301, subd. (a).) The guardianship orders cannot be challenged as void since the court had jurisdiction of the parties and the subject matter. (*Adoption of Myah M.* (2011) 201 Cal.App.4th 1518, 1531.) At best, the failure to refer the case to the department was an act in excess of jurisdiction which is valid until set aside and the parties may be precluded from doing so by the passage of time. (*People v. Ruiz* (1990) 217 Cal.App.3d 574, 584.) Moreover, while mother opposed the guardianship at the outset, and at some point later in the litigation, during much of the guardianship and at the time of the court's ruling at the termination hearing, she no longer did so.

The question is whether the failure to refer the case to the department in 2009 deprived mother of the opportunity to reunify with the minor and created a denial of due process in the termination proceeding. The facts do not support mother's contention that the termination proceedings were fundamentally unfair as a result of the probate court's failure to make a referral in 2009.

Despite mother's speculative claim that the department would have initiated a dependency, that she would have participated in services and regained custody, the actual facts belie the speculation. By the time the guardianship petition was filed, the minor had already been in the paternal grandmother's care for at least 10 days with no contact from mother. The petition did allege facts, which would have come within the provisions of Welfare and Institutions Code section 300, however, by the time the court investigator's report was available to the probate court, the minor had continued in the paternal grandmother's care for two months. The department was aware a referral had been made with respect to the minor's infant sibling, but no investigation occurred in Yolo County because the minor was safe in the paternal grandmother's care and mother had refused services as to the infant. The department is empowered to intervene only if a child is at risk. (Welf. & Inst. Code, §§ 300, 300.2.)

Even before the paternal grandmother filed the petition for guardianship, the minor was in her physical custody and was not at risk of harm from mother. At the beginning

of the guardianship, the probate court made efforts to monitor mother's compliance with programs and direct her to services in order to stabilize her so that regular visitation could occur. However, over the years of the guardianship, mother was in and out of custody, was ordered to complete four drug treatment plans, successfully participating in only the structured residential treatment portion of the programs, and visited the minor intermittently. When the probate court did belatedly refer the case to the department, the result was virtually identical to its response in 2009. The minor was in the care of the guardian and not at risk unless the guardianship was terminated.

Unlike the minor in *Christian G*., the minor was safe in the custody of a relative when the guardianship petition was filed. Mother had the opportunity to access services early in the process either through the child welfare agency or by complying with the probate court directives. Mother rejected both. She has continued to engage in a lifestyle of petty crimes and drug abuse and has not taken responsibility for her actions which led to the termination of her parental rights. As late as the termination hearing, she blamed her continued relapses and drug use on missing her son and being alienated from him rather than her own choices.

Mother was not prejudiced by the probate court's failure to refer her to the department at the outset of the guardianship proceeding because the facts show the outcome would have been unchanged had the referral occurred. Mother has not demonstrated a denial of due process in the termination proceeding.

13

II

*Indian Child Welfare Act (ICWA)*

Mother argues that reversal is required because the probate court failed to comply with the inquiry requirements of ICWA. Mother correctly notes that the record does not demonstrate that anyone inquired about her Indian heritage.[4]

ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for, and permitting tribal participation in, proceedings for both guardianship and termination of parental rights. (25 U.S.C. §§ 1901, 1902, 1903(1), 1911(c), 1912; Welf. & Inst. Code, §§ 224-224.6.) The court and the party seeking either guardianship or termination of parental rights "have an affirmative and continuing duty to inquire whether a child is or may be an Indian child." (Cal. Rules of Court, rule 5.481(a).) That party must ask the parent "whether the child is or may be an Indian child and must complete the *Indian Child Inquiry Attachmen*t (form ICWA-010(A)) and attach it to the petition." (Cal. Rules of Court, rule 5.481(a)(1).) At the first appearance by a parent at the initiation of any guardianship or proceeding to terminate parental rights, the court must order the parent "to complete *Parental Notification of Indian Status* (form ICWA-020)." (Cal. Rules of Court, rule 5.481(a)(2).)

Here, the record shows that the court investigator for the guardianship inquired about the paternal grandmother's Indian heritage but does not show the investigator asked

---

[4]     Both mother and the guardian filed requests that this court receive additional evidence on this point. We declined to do so and note, in passing, that the additional evidence proffered by the parties on whether there was inquiry and whether mother has any Indian heritage is in conflict. (*In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1389 [Appellate courts are not triers of fact].)

mother about her Indian heritage when she was interviewed. [5] There is no ICWA-010(A) attached to the guardianship petition, although form GC-210(CA), which is attached, states the child is not a member of, or eligible for membership in, an Indian tribe recognized by the federal government. Mother appeared at the first hearing on the guardianship petition in May 2009. The minute order does not reflect that the court inquired about her Indian ancestry or provided an ICWA-020 form to her. No ICWA-020 form appears in the record. Similarly, neither the petition to terminate parental rights nor the probation report suggest there was any inquiry made of mother's possible Indian heritage and the record does not show the court inquired about the parties' Indian heritage when mother was served with the petition to terminate parental rights.

Part of the duty of inquiry is to provide information to the court so that the court can rule on the question of whether ICWA applies. (*In re L.S.* (2014) 230 Cal.App.4th 1183, 1198.) Neither the paternal grandmother nor the court investigator provided any information on mother's Indian heritage or gave any explanation why the information was not available. If the court inquired and made the ICWA-020 form available to mother, that information is not reflected in the minutes of her first appearance. In the absence of information, we cannot say that the duty of inquiry was satisfied by anyone. Remand is required to permit the court to clarify the facts of inquiry and possible Indian heritage and determine whether further action is necessary. We are mindful that vague information will not support further inquiry or notice (*In re Hunter W.* (2011) 200 Cal.App.4th 1454, 1467-1468), but the record must reflect that some inquiry was made and the results thereof (*In re L.S.*, at p. 1198).

---

[5] Mother suggests that notice to the Cherokee tribes is required based on the paternal grandmother's statement to the court investigator. We disagree. The paternal grandmother's statement does not claim Cherokee heritage, it disavows any significant connection. The statement does not provide sufficient information of Indian heritage for the court to have reason to believe the minor may be an Indian child.

## DISPOSITION

The order terminating parental rights is reversed. The case is remanded to the trial court for the limited purpose of determining whether the inquiry provisions of ICWA were satisfied. If not, the court is directed to inquire of mother whether she has Indian heritage and, if so, to require her to provide all known information to complete an ICWA-030 form for notice to the relevant tribe or tribes. If mother does not identify any Indian heritage or if, after notice, the court determines ICWA does not apply, the orders terminating parental rights shall be reinstated. If the court finds after inquiry and notice that ICWA applies, the court shall hold such further proceedings as are appropriate.


           ROBIE           , J.


We concur:


       BLEASE       , Acting P. J.


       MURRAY      , J.